Niki MOREHEAD and Linda
Smith, Plaintiffs,

v.

Ritha LEWIS, Joseph Lewis, and Joseph
P. Lewis Real Estate Co., Defendants.

No. 76C3134.

United States District Court,
N. D. Illinois, E. D.

June 10, 1977.

Horace Fox, Jr., Kate Dawes, Chicago, Ill., for plaintiffs.

Morton Lewis, Chicago, Ill., for defendants.

## MEMORANDUM

LEIGHTON, District Judge.

This is a motion for reconsideration of an order that awarded plaintiffs compensatory damages and attorney fees but did not include punitive damages or costs. The suit is one in which plaintiffs seek relief from an alleged housing discrimination practice, pursuant to Title VIII of the Civil Rights Act of 1968, 42 U.S.C § 3612(c).

The motion is granted; and after reconsidering the evidence, memoranda, affidavits; and relying on case law, its knowledge and experience, the court concludes that the amount of the compensatory damages and attorney fees awarded is adequate; but that plaintiffs should recover their costs from defendants. Accordingly, the order is vacated and another will be entered modified only to provide for plaintiffs' recovery of costs. This memorandum will be extended to include the reasons for the court's conclusion. First, however, the facts from which the questions arise.

### I.

On August 23, 1976, Niki Morehead, a young Caucasian woman, and Linda Smith, a young Negro woman, both unmarried, filed a one-count complaint against Ritha Lewis, Joseph Lewis and Joseph P. Lewis Real Estate Company alleging that in violation of state and federal laws, defendants, Chicago landlords, wrongfully refused to rent them an apartment because they were unmarried and because Linda Smith was " * * * of minority ancestry." Two days later, based on the complaint, supported by affidavits, plaintiffs moved this court for preliminary injunctive relief to restrain defendants from renting the apartment in question. Hearing of the motion began at approximately 3 p. m. on the afternoon of August 27, 1976. The testimony of the two plaintiffs, that of three witnesses, and three exhibits were offered in support of the motion. One defendant testified against the motion; and in addition, one exhibit was offered and received by the court. From this evidence, the following were shown to be the undisputed facts.

For about 10 or 11 years prior to June 1976, Ed and Norma Nelson had lived in the building located at 739 West Brompton Avenue in the city of Chicago owned by Ritha Lewis and her brother, Joseph. From May 1, 1975, and for a monthly rental of $190, they had possession of Apartment No. 3 North on a written lease that was to expire April 30, 1977. Late in the spring of 1976, the Nelsons decided to purchase a home in Oak Park, Illinois. They posted a notice on the bulletin board of their church announcing that their apartment was going to be

available. Sometime near June 1, Niki Morehead and Linda Smith saw the announcement, visited the apartment, liked it, and expressed a desire to rent it. As a result, and by an appointment, they and Ed Nelson, met Ritha Lewis and her brother Joseph on the evening of July 23, 1976 to discuss the possibility of the two young women becoming tenants of the Lewis' after the Nelsons closed the transaction by which they were going to purchase their new home in Oak Park.

The meeting was friendly; there was a discussion of the young women's desire to rent the Nelson apartment; mention was made of the written lease; but the landlords made statements indicating that it was going to be cancelled. Then, the prospective tenants were each given a form by which they could apply for the apartment. These were filled out with the understanding that their credit was to be checked. They were told that the rent was going to be $200 per month; but when they offered to pay a security deposit, Ritha Lewis was willing to accept it, Joseph Lewis was not. Nonetheless, it was understood that the landlords would advise the two young women of their decision concerning the apartment when the credit reports were received.

The following Monday, however, Ritha Lewis telephoned Linda Smith and told her that the Nelson apartment was not available because for over a year Joseph Lewis had promised it to a friend. When asked by Linda Smith if there was another reason, Ritha Lewis said that she and her brother " * * * had decided not to rent to single women"; adding that in the past, they had experienced difficulties when they rented apartments to unmarried females. A few days later, on August 18, two young men, Edward J. Sekal and Joseph Carney, investigators for the Chicago Commission on Human Relations, went to the Lewis home to inquire if they had an apartment for rent. They were told that one was going to be available on September 1, 1976; it was the Nelson apartment which the Lewis' agreed to rent to the men for $225 per month. A written lease was prepared by Joseph Lewis

and later signed by Sekal and Carney. Three days later, Kathleen Catella, another employee of the Chicago Commission on Human Relations, served Ritha Lewis with a housing discrimination complaint that had been made to the Commission. In a conversation about the subject, Ritha Lewis said that she did not want to rent an apartment " * * * to [Niki Morehead and Linda Smith] because she had difficulty in the past with single women * * *. She wanted to rent to families only."

The hearing that established these facts took between two and a half to three hours. No legal question was presented; and at its conclusion, the court reviewed the case and concluded that while race discrimination had not been proved, the claim of sex discrimination had been established. In a colloquy that followed, the court learned that defendants were willing to approve a sublease of the Nelson apartment, provided the existing lease remained in force with the Nelsons liable for the rent. Thereupon, the court referred the lawyers to the federal statute which provides that " * * * after the alleged discriminatory housing practice * * * the court shall continue such civil case * * * from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in a satisfactory settlement of the discriminatory housing practice complained of in the complaint * * *." 42 U.S.C. § 3612(a). Accordingly, the cause was continued to September 8, 1976, with no order being entered, to enable the parties to formalize an agreement that would dispose of the controversy.

The day following the hearing, defendants' counsel wrote to plaintiffs' lawyers expressing the landlords' willingness to have the two young women as tenants on a sublease by the Nelsons. When, on the continued date, the parties were again in court, settlement discussions were progressing; so, the case was continued once, then again to October 15 when it was reported to the court that the young women had moved into the apartment and that the parties had

agreed to have the evidence heard in support of the motion for preliminary injunction considered in disposing of the case on its merits. Therefore, on October 22, the court entered an order in which it found " * * * that defendants while not guilty of race discrimination, committed sex discrimination against plaintiffs with regard to the housing described in the complaint." Judgment was entered in plaintiffs' favor with the question of damages, attorney fees and court costs being reserved for determination pursuant to 42 U.S.C. § 3612(c). No appeal was taken from this judgment.

A short time later, a motion was filed asking that defendants be ordered to pay plaintiffs damages, actual and punitive, attorney fees and costs. It was supported by two affidavits that itemized the service of plaintiffs' lawyers. One stated that from August 19, 1976 to November 5, 1976, 22 hours of research and preparation, 5 court appearances, and one trial day had been spent on the case. For this plaintiffs had been billed $1,380 plus $151.50 in expenses, a total from one lawyer of $1,531.50. The other stated that 51 hours and 45 minutes were devoted to the case for which plaintiffs had been billed $2,073.75. This affidavit was later supplemented to include 9½ hours additional time to December 4 for which it was said plaintiffs were billed $380, a total for the two lawyers of $3,833.75 in fees. Neither affidavit disclosed the fee agreement. After considering the memoranda in support of and in opposition to the motion, consulting the decisions of other courts on the subject, resorting to its experience and knowledge concerning compensation of lawyers, and weighing the factors that determine just compensatory damages, this court ordered that defendants pay $750 in attorney fees and $150 to each plaintiff for compensatory damages.

## II.

It is this order that the lawyers for plaintiffs ask this court to reconsider. They argue that the amount of compensatory damages and attorney fees awarded is in-

sufficient; that defendants should have been ordered to pay punitive damages because they deliberately violated plaintiffs' civil rights; and that costs should have been awarded since plaintiffs were successful on the merits of their claim of sex discrimination. This argument, and the fact that it implicates important rights of the parties, requires a review of the features of this case that influenced the court's judgment.

■ To begin with, this was a simple, uncomplicated housing discrimination case in which two young women, one white, one black, claimed they were victims of a discriminatory housing practice because of the race of one of them, and both were unmarried females. Their lawyers were new to the bar. In fact, public records of which this court will take judicial notice, disclose they were admitted to practice less than three months before occurrence of the events that led to this suit. The court knew, from observing the relation of practitioners before it, that both lawyers were associated with the General Counsel of the Leadership Council for Metropolitan Open Communities, an organization that " * * has successfully used [federal] laws and constitutional provisions on behalf of minority homeseekers to effect open housing under law." This organization publishes and distributes to laymen, lawyers, and judges a "Guide to Practice Open Housing," a brochure that details the investigation and handling of a housing discrimination case, including forms of pleadings, the applicable law, and the cases upholding the rights of plaintiffs in this field of civil rights litigation. The complaint filed in this case, although sketchily drafted and barely meeting the minimum standards of literacy, conformed to the format suggested by the Council in its brochure. Therefore, this court could tell that this simple, uncomplicated, statutory claim did not require any prior research, either concerning the facts or the law.

Four days after the complaint was filed, the court heard the motion for preliminary injunctive relief. The hearing took the lat-

ter part of an afternoon, less than three hours; and during it, no legal question was presented, nor was there any difficult issue of fact to be resolved. From the testimony, this court was able to see rather quickly that this was not a case of race discrimination; it was one in which two elderly landlords had used some unpleasant experience with single women as the reason for denying the plaintiffs a housing opportunity. This, as the court told the parties, was a violation of the applicable federal law. No evidence was presented, either at the hearing or later, which showed that plaintiffs had suffered any pecuniary loss. The complaint did not allege that plaintiffs had been humiliated or embarrassed by the defendants. The closest thing to this was the testimony of both plaintiffs that they were "upset" when they learned from Ritha Lewis that an apartment they liked and wanted to rent was not available. But in the judgment of this court, this aspect of the controversy was resolved by defendants' willingness to have the young women as their tenants under a sublease arrangement with the Nelsons. Therefore, resorting to the spirit of the underlying congressional enactment, this court did not grant preliminary injunctive relief but instead relegated the parties to conciliation and negotiation by which plaintiffs, without inconvenience, would have possession of the apartment they wanted. In other words, the controversy was settled four days after the suit was filed; and had the lawyers followed the court's suggestions, this would have been the end of the case. It was this feature, and the others reviewed by this court, that guided the judgment made in deciding the reserved questions concerning compensatory damages, punitive damages, attorney fees and costs.

### A.

In a housing discrimination case like this one, Congress has provided that "[a federal] court . . . ., as it deems appropriate . . . ., may award to the plaintiff actual damages and not more than $1000 punitive damages . . . ." 42 U.S.C. § 3612(c). There is nothing in the history of the statute to suggest that in making this provision Congress intended the concept of actual damages to be construed differently than it is understood in the law of damages. Generally, it is said that the phrase "actual damages" is synonymous with "compensatory damages," and means substantial as distinguished from nominal. *Southland v. Aaron*, 224 Miss. 780, 80 So.2d 823, 826 (1955); 25 C.J.S. *Damages* § 2 (1966). Compensatory damages are an amount, though difficult to ascertain precisely, which indemnifies a plaintiff for injury and damage suffered by him. *Reynolds v. Pegler*, 123 F.Supp. 36, 38 (S.D.N.Y.1954). The term covers all loss recoverable as a matter of right. 22 Am. Jur.2d *Damages* § 11 (1965). This, in a housing discrimination case as shown by the evidence, would include inconvenience, mental anguish, humiliation, embarrassment, expenses, and deprivation of constitutional rights. *Stevens v. Dobs, Inc.*, 373 F.Supp. 618 (E.D.N.C.1974); see *Sanborn v. Wagner*, 354 F.Supp. 291 (D.C.Md.1973).

Thus, where a race discriminatory housing practice is proved, and the plaintiff showed pecuniary loss of $13.25 in telephone expense, $125 for moving and storage, an award of $1000 in compensatory damages that included $861.75 for emotional distress and humiliation was upheld on appeal. *Steele v. Title Realty Company*, 478 F.2d 380 (10th Cir. 1973). However, where in a like case, the plaintiff's complaint did not allege humiliation or embarrassment, and the record contained no evidence to prove these elements, it was not error for a trial court to deny recovery of compensatory damages, despite the contention that in an action of this kind the suit is to recover for a "dignitary tort," damages need not be proved. *Fort v. White*, 530 F.2d 1113, 1116 (2d Cir. 1976); see *Curtis v. Loether*, 415 U.S. 189, 196, n.10, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); compare *Seaton v. Sky Realty Co.*, 491 F.2d 634 (7th Cir. 1974).

In this case, the complaint did not allege that plaintiffs suffered humiliation

or embarrassment. Nor is there any evidence to support such a claim. There is only a passing statement in their testimony that when they learned they could not have the apartment they wanted, they were both "upset." For these reasons, this court, in the exercise of the mandate that it grant relief "as it deems appropriate," concluded that under these circumstances, plaintiffs now being tenants and neighbors of defendants, recovery of $150 to be paid each of them was compensatory as actual damages. See 42 U.S.C. § 3612(c).

### B.

■ As to the argument that plaintiffs should have been awarded punitive damages, this court, when it entered the order being reconsidered, had in mind that "compensatory damages" and "punitive damages" differ in nature and purpose, one is given as compensation and the other purely as punishment and by way of example. *Hall v. Berkell*, 130 Cal.App.2d 880, 279 P.2d 832, 835 (1955). However, when Congress provided for the award of punitive damages in cases like this one, it did not intend that this be done for every violation of the statute. *Steele v. Title Realty Co.*, 478 F.2d 380 (10th Cir. 1973). Punitive damages, as a rule, are disfavored in the law, and are awarded where willful or wanton conduct can be shown, or as a means of deterrence. *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1974); *Wright v. Kaine Realty*, 352 F.Supp. 222 (N.D.Ill.1972); *Lamb v. Sallee*, 417 F.Supp. 282 (E.D.Ky.1976). When it is a form of relief, "[t]he final determination of whether punitive damages should be awarded has to be left to the trier of fact." *Gill v. Manuel*, 488 F.2d 799, 801 (9th Cir. 1973); *Lee v. Southern Home Sites Corporation*, 429 F.2d 290, 294 (5th Cir. 1970); compare *Parker v. Shonfeld*, 409 F.Supp. 876 (N.D.Cal.1976). Here, because there is no evidence of malicious and willful conduct, this court, in the exercise of its discretion, decided that punitive damages should not be awarded. See *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119 (7th Cir. 1974); 22 Am.Jur.2d *Damages* §§ 238, 239 (1965).

### C.

In the same statute it gave a court the power to grant, as relief, actual damages in a housing discrimination case, Congress authorized that a prevailing plaintiff may be awarded reasonable attorney fees, provided it is found that party is financially unable to pay an attorney. 42 U.S.C. § 3612(c). This statute mandates a finding that the plaintiff is not financially able to assume such fees. *Fort v. White*, 530 F.2d 1113, 1119 (2d Cir. 1976). Hence, over defendant's contention that plaintiffs were able to pay their attorneys because they earned $9000 and $10,000 per year, respectively, this court found they were not financially able to pay an attorney. See *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1974); compare *Stevens v. Dobs, Inc.*, 373 F.Supp. 618 (E.D.N.C.1974). Therefore, the court turned to a determination of what were reasonable attorney fees, considering the rights of all the parties, and the features of the case. Compare *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119 (7th Cir. 1974); *Parker v. Shonfeld*, 409 F.Supp. 876 (N.D.Cal.1976).

■ Every experienced judge knows the importance of awarding fees to a prevailing plaintiff in a civil rights suit. The allowance of attorney's fees in such a case is not to penalize the defendants, but is for the purpose of encouraging individuals injured by discrimination to seek judicial relief. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *Steele v. Title Realty Company*, 478 F.2d 380 (10th Cir. 1973).

Although such awards are generally discretionary, in a case like this one they are a kind of effective remedy that Congress has empowered a court to fashion to encourage public minded suits and to carry out congressional policy. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

■ However, in determining the amount of fees that are reasonable, the hours claimed or spent on a civil rights case is not the sole basis for a court's decision.

*Weeks v. Southern Bell Telephone and Telegraph Co.*, 467 F.2d 95 (5th Cir. 1972). The guidelines are well known, and the factors are sometimes difficult to weigh. See *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir. 1974). But in any event, a court must not simply accept the attorneys' account of the value of their services; nor should they be compensated for unnecessary work; that is, legal services which show an attempt to minimize duplication of effort among lawyers. *Stanford Daily v. Zurcher*, 64 F.R.D. 680 (N.D. Cal.1974). This is so because "[t]he court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value." *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940); *Weeks v. Southern Bell Telephone and Telegraph Co.*, 359 F.Supp. 1219 (S.D. Ga.1971); 7 C.J.S. *Attorney and Client* § 191d (1937). For these reasons, this court determined that an award of $750 for attorney fees was sufficient under the circumstances of the case. Compare *Williamson v. Hampton Management Company*, 339 F.Supp. 1146 (N.D.Ill.1972); *Sanborn v. Wagner*, 354 F.Supp. 291 (D.Md.1973); *Walker v. Fox*, 395 F.Supp. 1303 (S.C.Ohio 1975).

### D.

■ As for the costs of this litigation, the failure to include them in the award was a judicial oversight. Long before enactment of the Civil Rights Act of 1964, it had been the rule in federal courts that in the absence of some reason in equity, or one that would otherwise control, costs generally followed the final judgment in favor of the prevailing party. *Connolly v. Commercial National Bank in Shreveport*, 89 F.Supp. 976 (D.C.La.1950); see 20 Am. Jur.2d *Costs* §§ 8, 14 (1965); 20 C.J.S. *Costs* § 8 (1940). When, in this case, the relief granted was fashioned, the court intended that each plaintiff receive as compensatory damages $150, and $750 with which to pay their attorneys. It would defeat this intent if plaintiffs are required to bear the costs of this litigation. Therefore, on vacature of the judgment that has been reconsidered, one will be entered that will provide that in addition to the awarded compensatory damages and attorneys fees, they recover their costs from defendants.

So ordered.