ANVIL INVESTMENT LIMITED PARTNERSHIP *et al.*, Plaintiffs-Appellees, *v.* THORNHILL CONDOMINIUMS, LTD., *et al.*, Defendants-Appellants.

First District (4th Division)   No. 78-2011

Opinion filed June 12, 1980.

James D. Goodman and Edgar A. Blumenfeld, Ltd., both of Chicago, for appellants.

Morris J. Coff and Ronald R. Rassin, both of Chicago (Fink, Coff and Stern, of counsel), for appellees.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Plaintiffs brought this action pursuant to the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1977, ch. 121½, pars. 137.12, 137.13) and sections 12 and 17 of the Federal Securities Act of 1933 (15 U.S.C. §§77(1), 77(q) (1976)), to rescind their purchase of interests in a real estate limited partnership. Plaintiffs' complaint alleged violations involving the misstatement and nondisclosure of material facts as well as failure to file a registration statement. The trial court, sitting without a jury, made a determination that defendants had violated provisions of the two statutes. The court ordered rescission of the purchase agreement, entered a judgment in the amount of $437,500, and ordered payment of funds held by the First National Bank of Chicago in partial satisfaction of judgment. The court also entered judgment against defendants John A. Meatte and Kenneth F. Kortas for punitive and exemplary damages. We affirm the trial court.

Defendants appeal from the judgment of the trial court and place before this court the issues of whether the trial court erred in (1) admitting into evidence complaints of other lawsuits, (2) denying defendants' motion to vacate judgment, and (3) awarding punitive damages and attorneys' fees.

A summary of the facts includes the following: In 1973, defendants Meatte and Kortas conducted business principally in the purchase and sale of real estate. They entered into both private and syndicated transactions by means of selling interests in limited partnerships. They facilitated their business by making use of several different corporations. Among those were defendant ProVest, Inc., Sterling Enterprises, Inc., and Dev-Tex., Inc.

In 1977 defendants Meatte and Kortas made private efforts to buy the Thornhill apartment complex located in Houston, Texas. They sought the property for the purpose of converting it to condominiums. Defendants' efforts to acquire the real estate led them to obtain an option to buy the property from the First National Bank of Chicago (hereinafter First National Bank) under a letter of agreement dated April 19, 1977. Financing was not obtained in time to exercise the option to purchase the property, and, as a result, the option was forfeited on October 4, 1977.

Defendants then chose the alternative of syndicating limited partnership interests to acquire the funds needed to buy the property. In January 1978, they decided to raise $525,000 from limited partners, and

they proposed to use such funds to supplement other financing. A prospectus for the partnership was prepared during February 1978 and presented to plaintiffs. It was never filed with the Secretary of State of Illinois. Between May 15 and May 18, 1978, plaintiffs purchased 25 units of the Thornhill condominium limited partnership for a total of $437,500. Some of the investors made physical inspections of the Thornhill property personally or through representatives.

The prospectus contained representations of the Thornhill real estate, the financing of the partnership business, and the performance of the defendants in other real estate transactions. It described a mortgage loan of $3,040,000 to be made by Citizens Mortgage Corporation, and an additional loan of $760,000 being obtained from an unspecified source. The $3,040,000 loan was never granted.

The prospectus also made representations as to the description of the Thornhill property, including 10 pages of pictures, diagrams, floor plans, a map, and 2 pages of textual data.

The prospectus contained representations concerning prior accomplishments of defendants as promoters of real estate projects. It contained statements concerning a property called Bimini Isle, located in Houston, Texas. Bimini Isle was the subject of a venture defendants promoted through a syndicated limited partnership, which was described in the Thornhill prospectus as "[a]n example of a successful condominium conversion with which the general partners and their affiliates were associated * * * ."

In May 1978, the First National Bank sent to defendants a "backup" contract for the Thornhill property, stipulating that the Bank would consider final execution if its pending deal with another buyer failed to solidify. Later that month, the other buyer executed a contract for the property, thereby making it unavailable to defendants. Nothwithstanding this, defendants executed and submitted the "backup" contract. The contract contained amendments that were later declared unacceptable by the bank.

Defendants' difficulties in acquiring the property were first discovered by securities broker Richard Emerson. On May 23, 1978, Emerson had a conversation with an officer of the First National Bank who indicated the property was firmly contracted to another buyer. Emerson confronted defendants with the information gained from the bank officer. Their response was that a suit had been filed in Houston, Texas, seeking to prevent the bank from selling the property to anyone but defendant Dev-Tex, Inc., owned by the Thornhill partnership. When certain plaintiffs were informed of the circumstances, they grew impatient and began to demand a refund of their money. On July 24, 1978, defendants were told that if the Houston suit did not end favorably

by July 31, rescission would be sought. When the suit was decided against defendants, rescission was demanded.

On August 16, 1978, plaintiffs, all of the limited partners, brought this action. The same day, defendants notified them that a new but unidentified property had been selected in Houston to serve as a substitute for Thornhill. By that time, approximately $63,000 of plaintiffs' initial contribution of $437,500 had been expended by defendants.

# I

In their appeal to this court, defendants question the relevance of complaints from other lawsuits which were presented at trial. Specifically, they contend that three complaints taken from lawsuits involving other real estate deals and defendants Meatte and Kortas should not have been admitted into evidence, the admission of such evidence being highly prejudicial.

On November 1, 1976, defendant Meatte and others were sued in the District Court of the United States for the Northern District of Illinois, Eastern Division. They were charged with violations of certain sections of the Federal Securities Act by certain investors in a "Mission Street Plaza" real estate development. The venture, a limited partnership with defendant Meatte as a general partner, was formed to acquire and operate a shopping center in Mt. Pleasant, Michigan. In that suit, defendants were charged with failure to disclose to their limited partners the difficulties in purchasing the shopping center, failure to disclose defendants' efforts to acquire substitute real estate, failure to disclose high risk factors in the substitute property, and falsely representing material facts.

On December 16, 1977, defendants Meatte and Kortas, with others, were sued in the District Court of the United States for the Northern District of Illinois, Eastern Division. They were charged with violations of certain sections of the Federal Securities Act by certain investors in an "Equity Properties" real estate development. The venture was a limited partnership formed to acquire and operate a 123-unit apartment complex in Houston, Texas. In that suit, the defendants were charged with material false representation and failure to disclose material information.

On December 23, 1977, defendants Meatte and Kortas, with others, were sued in the Federal District Court for the Northern District of Illinois, Western Division. They were charged with violation of the Federal Securities Act by an investor in a "Blalock Manor" real estate development. Blalock Manor was also formed with a limited partnership. Its purpose, was to acquire a 164-unit apartment complex in Houston, Texas. In that litigation, the defendants were charged with making material false representations and failure to disclose material information.

The complaints from each of those actions were admitted into evidence to establish that litigation was pending against defendants at the time of the issuance of the venture prospectus. The ongoing litigation was not disclosed to plaintiffs in the prospectus, and they had no other knowledge of it. This, plaintiffs claim, was a failure to disclose material information and, therefore, the complaints were relevant to the issues on trial and were properly admitted into evidence.

The issue defendants raise concerning the relevance of evidence is evasive of the more fundamental issue of materiality. The basic question is whether the litigation in which defendants were involved, as evidenced by the complaints, was material to the plaintiffs' purchase of securities. If so, the complaints should have been admitted at trial. We hold the complaints were properly admitted.

The test for materiality of misrepresentation or omission relied on in an action for violation of the Federal securities law is whether a reasonable and prudent investor would attach importance to the facts or fact omitted or misrepresented in determining his choice of action in the transaction in question. See *Affiliated Ute Citizens v. United States* (1972), 406 U.S. 128, 31 L. Ed. 2d 741, 92 S. Ct. 1456; *Mills v. Electric Auto-Lite Co.* (1970), 396 U.S. 375, 24 L. Ed. 2d 593, 90 S. Ct. 616; *Securities & Exchange Com. v. Texas Gulf Sulphur Co.* (2d Cir. 1968), 401 F.2d 833.

The question of materiality in an action brought under the State securities law requires that we recall the purpose of the legislation. The indicated purpose of the Illinois securities law has been to furnish information, to protect credulity and ignorance from deception, and prevent fraudulent and deceitful sales of securities (*Stewart v. Brady* (1921), 300 Ill. 425, 439, 133 N.E. 310, 315), and to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have no control (*Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446, 456, 163 N.E.2d 236, 241).

As well, this court takes judicial notice that the Federal Securities and Exchange Commission (hereinafter SEC) recognizes the category of securities generated by investment in real estate limited partnerships. The SEC has issued guides for the registration statements filed upon issuance of such securities. In 1968 the SEC published a Release No. 33-4836 which announced the guides. In that release, the Commission stated:

> "These guides are not rules of the Commission nor are they published as bearing the Commission's official approval. They represent policies and practices followed by the Commission's Division of Corporate Finance in the administration of the registration requirements of the Act, but do not purport to furnish complete criteria for the preparation of registration statements." (SEC Accounting Rules (CCH) §8001 (March, 1979).)

In 1976 the SEC Division of Corporate Finance issued a publication entitled "Guide 60, Preparation of Registration Statements Relating to Interests in Real Estate Limited Partnerships" (39 Fed. Reg. 10278 (1974) (17 C.F.R. §231)). It contains information offered to assist issuers, accountants, attorneys and others in the preparation of registration statements.

"Guide 60" is cited by plaintiffs, and although it is not a Commission rule nor is it published as bearing the Commission's official approval, it contains comments and suggestions that the Division of Corporate Finance has developed in processing of registration statements relating to real estate limited partnerships (41 Fed. Reg. 17403-4 (1976) (17 C.F.R. §231)). The case before us clearly demonstrates the utility of such guidelines. In pertinent part, "Guide 60" reads as follows:

> "8. PRIOR PERFORMANCE OF THE GENERAL PARTNER AND AFFILIATES
>
>> A. A tabular presentation providing a reasonable summary of the experience of the General Partner and its affiliates during the last five years in the investment of investor funds * * * in real estate"

and

>> "D. *The amount of and reason for any contingent liabilities of the General Partner with regard to prior programs now in existence should be disclosed.*" (Emphasis added.) 39 Fed. Reg. 10278, 10280 (1974) (17 C.F.R. §231).

In our view, materiality is the basis for advising the disclosure of contingent liabilities in a registration statement. We do not adopt the plaintiffs' argument that the litigation pending at the time of the purchase was a demonstration of "mangement's lack of success with similar partnerships, or other real estate investments." The Federal complaints found in the record would be inadmissible as hearsay to prove any assertions they may contain. Rather, the litigation to which defendants Meatte and Kortas were parties represented *contingent liabilities involving prior programs.* Such information, had it been disclosed, may have signaled prudent investors to re-evaluate the financial position of the promoters as well as their ability to manage the proposed venture. Therein lies our measure of materiality.

We disagree with defendants' argument that the introduction of the complaints had a chilling effect on the trial court. The trial judge commented in his final order that plaintiffs had a right to know three separate suits had been filed against defendants in two divisions of the United States District Court for the Northern District of Illinois. The trial court was correct in determining that:

> "* * * Plaintiffs * * * had a right to know that * * * limited partners were unhappy enough with said Defendants to bring suits

against them charging material false representations and failure to disclose information in an éffort to defraud. Failure to disclose said facts and conditions was an omission of material facts known to Defendants, but unknown to Plaintiffs when they invested in the ill-fated THORNHILL deal."

■■ We find the complaints presented as evidence to have been relevant to material facts not disclosed at the time of the securities purchase. They were offered to show pending litigation and contingent liabilities of defendants. Therefore, they were properly admitted into evidence.

## II

Defendants assert the trial court should have vacated the final judgment, arguing it was against the manifest weight of the evidence. "To be against the manifest weight of the evidence, an opposite result must be clearly evident and the verdict must be palpably erroneous" (*Waldorf v. Marlas* (1977), 56 Ill. App. 3d 358, 362, 371 N.E.2d 1021, 1024.) No such result obtains in this case.

The right to rescind asserted by plaintiffs and upon which judgment was based is derived from statute. We note, first, that section 13 of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1977, ch. 121½, par. 137.13) provides the remedy of rescission for any violation of the statute. One such violation is the failure to file a registration statement with the Secretary of State of Illinois prior to the sale of securities. Sections 12 and 5 specifically outline the requirements of registration. Section 12 reads, in pertinent part:

"It shall be a violation of the provisions of this Act for any person:

\* \* \*

B. To deliver to a purchaser any security required to be registered under Section 5 \* \* \* hereof unless accompanied or preceded by a prospectus \* \* \* that meets the requirements of the pertinent Subsection 5 \* \* \* ." (Ill. Rev. Stat. 1977, ch. 121½, par. 137.12(B).)

Section 5 provides:

"All Securities except those exempt \* \* \* shall be registered prior to sale in this State either by Notification, or by Description, or by Qualification, as hereinafter in this Section provided;\* \* \* ." Ill. Rev. Stat. 1977, ch. 121½, par. 137.5.

It was stipulated at trial that defendant Thornhill Condominiums Ltd. failed to file a registration statement. Defendants did not provide any proof to establish an exemption to the registration requirements nor did they offer an explanation of their failure to comply. There is ample reason in that single violation to support the trial court's judgment rescinding the purchase.

A fundamental objective of the Illinois securities law is the protection of the investing public by way of the office of the Secretary of State of Illinois. Promoters of ventures who proceed to transact business without registration fly in the face of that objective.

Beyond the failure to meet the statutory requirements of registration, plaintiffs assert that several material facts were not disclosed by defendants. For purposes of this opinion, we are most concerned with representations made regarding primary financing and property acquisition.

The provisions of section 12(G) of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1977, ch. 121½, par. 137.12(G)) were patterned after section 17 of the Federal Securities Act of 1933 (15 U.S.C. §77(q)) (see *Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 317 N.E.2d 384). Plaintiffs base their complaint on these two sections. We refer to the Illinois statute, which provides:

> "It shall be a violation of the provisions of this Act for any person:
> * * *
>
> G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or *any* omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." (Emphasis added.) Ill. Rev. Stat. 1977, ch. 121½, par. 137.12(G).

Plaintiffs point to the following statement found in the prospectus as being material and untruthful:

> "Citizens Mortgage Corporation has agreed to accept an application for a construction loan in the amount of $3,040,000 * * * ."

They argue the untruthfulness of this statement by pointing to a letter sent to defendants Meatte and Kortas by Citizens Mortgage Corporation (hereinafter Citizens) on April 7, 1978, several weeks prior to issuance of the prospectus and surrender of investment funds. The letter stated, in effect, that the loan application had been declined and the decision was final.

Further, the record indicates that Citizens never considered a $3,040,000 loan as stated in the prospectus. Documentation dated prior to the April 7 letter had only contemplated an unconditional loan of $2,530,000. Defendants submit the $3 million figure does appear in a letter written by Citizens on January 23, 1978. However, plaintiffs retort that defendants failed to disclose to investors the terms of the letter or conditions upon which the floor of $2.5 million would be extended to a greater amount.

While we may foresee circumstances under which details of a loan agreement are of lesser importance to securities offerings, we find such information indispensable to real estate ventures. In the words of the trial court, "There is no doubt but that financing was critical to the transaction." Citizens had already rejected any participation in financing the Thornhill venture. The words, "has agreed to accept an application," as they appear in the prospectus, connote a commitment to lend, and this court deems such a representation material. Defendants should have informed all parties concerned that the loan would not be made available as anticipated. Their failure to do so was in direct violation of securities regulations.

Another aspect of the transaction which we deem material is the process of acquiring the Thornhill property. Plaintiffs argue that failure of the prospectus to make known the uncertain status of the real estate acquisition was a deceptive omission of a material fact unknown to them. Plaintiffs' position is that they had a right to know that defendants had twice attempted and failed, because of insufficient funding, to exercise an option on the property in 1977. Interests in the Thornhill limited partnership were purchased during the period from May 15 to May 18, 1978. We are struck immediately by the fact that prior to May 12, 1978, the owner of the property, the First National Bank, had selected another buyer and, on May 12, mailed a copy of the contract to defendants. The bank informed defendants that they would be able to acquire the property only if the contract were not properly executed and returned by the other buyer. Although defendants Meatte and Kortas delivered a check for $50,000 to First National Bank, they were told it would not be negotiated, pending response from the first buyer. On May 23, 1978, First National Bank accepted the first buyer's executed contract and the Thornhill property was off the market. In the meantime, defendants had filed suit against the bank, in Houston, Texas, for specific performance. That suit was dismissed. Subsequent to the acceptance of the contract by First National Bank, defendants executed and submitted their "backup" contract. Information regarding the problems with the property acquisition reached plaintiffs on May 25, 1978, through securities broker Richard Emerson.

We are, here again, impressed with the significant relationship this information had to the proposed transaction. The acquisition of property constitutes the nucleus of any real estate deal, particularly a condominium conversion. Defendants should have disclosed information concerning difficulties in acquiring the property to each investor so that they could evaluate the true nature of their investment. Notwithstanding any provisions for substitution of property written into the subscription agreement, investors had a right to know the status of the Thornhill

property and any efforts made to acquire it. The point at which defendants knew a contract had been executed by another purchaser was the very latest the disclosure should have been made to plaintiffs. The property which gave name to the project partnership was then no longer available. Failure to include reference to that fact in the prospectus or in other communication with investors was an omission of a material fact known to defendants but unknown to plaintiffs.

■■ At this juncture, we recall the tests of materiality discussed earlier and find the purpose of our analysis is to determine whether a reasonable and prudent investor would attach importance to these facts in determining his choice of action. To aid us in our analysis, we turn to *Globus v. Law Research Service, Inc.* (2d Cir. 1969), 418 F.2d 1276, cited by defendants. In *Globus,* a case involving a securities transaction, the prospectus omitted the disclosure of a dispute between the issuer and a key supplier of the issuer. The supplier claimed that certain running accounts were not current. The issuer had planned and did, in fact, use proceeds from sale of securities issued to bring the account to current status. The omission was held to be a violation of the Federal Securities Act, and the investors were found to be entitled to rescind because of nondisclosure of the dispute. *Globus* is somewhat distinguishable from our case in that it involved a stock offering rather than a real estate limited partnership. We do find that both real estate limited partners and investors in stock are largely concerned with investing their money to gain the desired rate of return and, in doing so, take many assorted factors into consideration. From this standpoint, we adopt the reasoning that when it is shown that investors have taken into consideration information provided by the prospectus and that information changes to the knowledge of promoters but without the knowledge of investors, there is adequate basis to inquire as to whether such change or difference should have been disclosed.

■ We find the trial court had adequate evidence upon which to conclude defendants knew and should have disclosed that neither the financing nor the real estate for the proposed venture was available. The denial of the motion to vacate judgment was well supported by the evidence.

We are not persuaded by defendants' arguments concerning contributory negligence or statutory defenses, as the facts of this case do not conform to either theory.

### III

Plaintiffs submit the trial court erred in awarding punitive damages and attorneys' fees against defendants Meatte and Kortas. Generally, in Illinois punitive or exemplary damages are allowed only when a wrongful

act is accompanied by aggravated circumstances, including fraud, willfulness, wantonness, or malice. (See *Munson v. American National Bank & Trust Co.* (7th Cir. 1973), 484 F.2d 620; *City of Chicago v. Martin* (1868), 49 Ill. 241; *Quad County Distributing Co. v. Burroughs Corp.* (1979), 68 Ill. App. 3d 163, 385 N.E.2d 1108; *Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805; *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 340 N.E.2d 47; *Pierce v. DeJong* (1973), 13 Ill. App. 3d 889, 300 N.E.2d 782; 15 Ill. L. & Prac. *Damages* §132 (1968).) Punitive damages may also be awarded when a wrongful act is performed with reckless disregard for the rights of others. (*Bucher v. Krause* (7th Cir. 1952), 200 F.2d 576, 585.) Although such damages are generally disfavored in the law, they are awarded where willful or wanton conduct can be shown or as a means of deterrence (*Morehead v. Lewis* (N.D. Ill. 1977), 432 F. Supp. 674, 679). Additionally, the award of punitive damages must be accompanied by an award of actual damages. (*Spence v. Staras* (7th Cir. 1974), 507 F.2d 554.) The purpose of exemplary damages is to punish a defendant so as to teach him not to repeat his intentional, deliberate, and outrageous conduct, and to deter others from similar conduct. *George v. Chicago Transit Authority* (1978), 58 Ill. App. 3d 692, 693, 374 N.E.2d 679, 680.

■■ We agree with plaintiffs' argument that absent a statutory prohibition, punitive damages should be awarded independent of the cause of action. Such awards have been frequently made in cases involving statutory causes of action without specific statutory authorization. (See generally *Mansell v. Saunders* (5th Cir. 1967), 372 F.2d 573 (Civil Rights Act); *Basista v. Weir* (3d Cir. 1965), 340 F.2d 74 (Civil Rights Act); *Petition of Den Norske Amerikalinje A/S* (N.D. Ohio 1967), 276 F. Supp. 163 (Jones Act); *Wills v. Trans World Airlines, Inc.* (S.D. Cal. 1961), 200 F. Supp. 360 (Federal Aviation Act).) Statutes authorizing punitive damages are, indeed, rare. The remedy is usually one designed by the courts when justified under the facts of a given case.

Defendants suggest the award of exemplary damages is "repugnant" to the case law interpreting the right to damages under the securities laws. They again argue the case of *Globus v. Law Research Service, Inc.* (2d Cir. 1969), 418 F.2d 1276, to support their position. According to defendants, the court in *Globus* held that exemplary or punitive damages were not available for violations of provisions of the 1933 Federal Securities Act (15 U.S.C. §77a *et seq.*). In spite of this, we ratify the position of the *Globus* court as it states:

"But neither Congressional mindreading nor stenciling * * * provide a firm basis for decision. * * *.

The seminal question is whether punitive damage recovery is necessary for the effective enforcement of the Act. *Undeniably,*

> *punitive damages would deter violations of the Act and punish those who did commit violations."* (Emphasis added.) (*Globus*, 418 F.2d 1276, 1284-85.)

The key to the *Globus* decision is embedded in the opinion's next sentence:

> "But, as the trial court conceded, * * * plaintiffs under the securities acts already possess an extensive 'arsenal of weapons' which serve to perform the functions of retribution and deterrence." *Globus*, 418 F.2d 1276, 1285.

Here, we diverge from the finding of the United States Court of Appeals in *Globus*. The divergence is not caused so much by disagreement with the reasoning of the court as it is by failure of that reasoning under the circumstances of this case. The court of appeals outlines four deterrents to those who would commit willful violations of the securities laws. They are the following: (1) That section 24 (15 U.S.C. §77(x)) (inapplicable here) provides not only for a fine but for 5 years imprisonment; (2) that the SEC may suspend or expel those who violate the securities act; (3) that compensatory damages when multiplied by class action have a deterrent effect; and (4) that the securities industry is one in which a "good name" is invaluable.

Imprisonment is a remedy obviously not available to the trial court. In our case, the "good name" and license of the key defendants have been convincingly disputed. Defendant Kortas suffered temporary suspension of his license to sell securities, in Illinois, in December 1977. Further, the nine-plaintiffs before the court represent all of the investors and not a small group of the total number. There is no potential for a class action suit. The result of this evaluation is the "arsenal of weapons" or deterrents envisioned by the court in *Globus* have been effectively dismantled by the facts of this case. *Globus* does not sufficiently serve as authority for protection of plaintiffs or the citizens of this State.

We wish to draw our attention to the conduct of defendants that merits our support of punitive damages. We reiterate our deep concern that at the time of the securities sale neither the financing nor the real estate represented to investors through the prospectus was actually available. In fact, for purposes of the venture, they were unavailable. As well, defendants were involved in other litigation based upon their prior business conduct. The lawsuits represented contingent liabilities arising from prior ventures. None of this information was provided to investors prior to their purchase of securities.

At trial, it was determined that defendants did not want to disclose the problems with the venture because in their words it would "blow the deal." Yet, statements were made, such as the one informing plaintiffs that purchase of the property was "in the bag." Once defendants knew a valid

contract had been executed and the Thornhill property was unavailable, they continued to actively deceive investors. They undertook spurious litigation seeking specific performance. The complaint in that action alleged a valid contract between defendants and First National Bank when, clearly, no such contract existed. The action was summarily dismissed. As late as June 20, 1978, defendants were still describing their financial arrangements contrary to the written statements of the prime lender.

Defendants testified on direct examination that Sterling Towers, a prior venture, was a successful real estate project, illustrating and justifying representations in the prospectus as to the track record of defendants. On cross-examination, it was revealed that Sterling Towers was never built.

■■ It appears to this court that the sum of defendants' conduct was willful, did amount to malice, and certainly surpassed inadvertence or neglect. It is for that reason we affirm a remedy above and beyond statutory provisions. The law of this State will not tolerate the acts of those who, like defendants, wittingly lure unwary investors to the perils of financial mirages. We rule to prevent such a result. Despite the Federal remedies that may or may not be available to similarly situated plaintiffs, we heed the call to effectively protect citizens of this State from willful acts of abuse by persons transacting in the sale of securities.

Moreover, we wish to make firm that the final determination of whether punitive damages should be awarded is to be left to the trier of fact (*Morehead v. Lewis* (N.D. Ill. 1977), 432 F. Supp. 674, 679), and such determination will not be disturbed in the absence of an abuse of discretion (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 671, 344 N.E.2d 805, 818).

■■ Finally, it has been established that when fixing an award for exemplary damages, the court may properly consider as one element the amount of plaintiff's attorneys' fees. (*Chicago Title & Trust Co. v. Walsh* (1975), 34 Ill. App. 3d 458, 471, 340 N.E.2d 106, 115.) Where, as here, the finding of malice properly accompanies an award of punitive damages, plaintiffs' attorneys' fees may be taxable to defendants. We find the trial court's award of plaintiffs' attorneys' fees to be proper.

For the aforesaid reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P. J., and JIGANTI, J., concur.