**BROWN & WILLIAMSON TOBACCO CORPORATION, Plaintiff,**

v.

**Walter JACOBSON and CBS, Inc., Defendants.**

**No. 82 C 1648.**

United States District Court, N.D. Illinois, E.D.

Aug. 7, 1986.

Martin London, Lewis R. Clayton, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Max E. Wildman, David L. Schiavone, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for plaintiff.

Thomas H. Morsch, Richard J. O'Brien, Sidley & Austin, James A. Klenk, Reuben & Proctor, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Defendants Walter Jacobson and CBS, Inc. move to vacate the judgment entered against them and to enter judgment in their favor notwithstanding the verdicts or, in the alternative, for a substantial remittitur of damages or a new trial.

The complaint upon which this case was tried was initially dismissed. On appeal it was upheld and the case was remanded for trial. *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir. 1983). The Court of Appeals held that a television broadcast stating that advertising designed to attract children to smoke by associating smoking with pleasurable illicit activity—pot, wine, beer and sex— was libelous per se because it accused plaintiff Brown & Williamson Tobacco Co. ("B & W") of immoral conduct.

The Court of Appeals accurately described the nature of this case (as shown by the evidence at trial) as follows:

> In 1975, Ted Bates, the advertising agency that had the Viceroy account, hired the Kennan market-research firm to help develop a new advertising strategy for Viceroy. Kennan submitted a report which stated that for "the younger smoker," "a cigarette, and the whole smoking process, is part of the illicit pleasure category.... In the young smoker's mind a cigarette falls into the same category with wine, beer, shaving, wearing a bra (or purposely not wearing one), declaration of independence and striving for self-identity. For the young starter, a cigarette is associated with introduction to sex life, with courtship, with smoking 'pot' and keeping studying hours...." The report recommended, therefore, the following pitches to "young smokers, starters": "Present the

cigarette as part of the illicit pleasure category of products and activities.... To the best of your ability, (considering some legal constraints), relate the cigarette to 'pot', wine, beer, sex, etc. *Don't* communicate health or health-related points." Ted Bates forwarded the report to Brown & Williamson. ... Brown & Williamson rejected the "illicit pleasure strategy" proposed in the report, and fired Ted Bates primarily because of displeasure with the proposed strategy.

Years later the Federal Trade Commission conducted an investigation of cigarette advertising, and in May 1981 it published a report of its staff on the investigation. The FTC staff report discusses the Kennan report, correctly dates it to May 1975, and after quoting from it the passages we have quoted states that "B & W adopted many of the ideas contained in this report in the development of a Viceroy advertising campaign." In support of this assertion the staff report quotes an internal Brown & Williamson document on "Viceroy Strategy," dated 1976, which states, "The marketing efforts must cope with consumers' attitudes about smoking and health, either providing them a *rationale* for smoking a full flavor VICEROY or providing a means of *repressing* their concerns about smoking a full flavor VICEROY." The staff report then quotes a description of three advertising strategies. Although the description contains no reference to young smokers or to "starters," the staff report states: "B & W documents also show that it translated the advice [presumably from the Kennan report] on how to attract young 'starters' into an advertising campaign featuring young adults in situations that the vast majority of young people probably would experience and in situations demonstrating adherence to a 'free and easy, hedonistic lifestyle.'" The interior quotation is from another 1976 Brown & Williamson document on advertising strategy.

On November 4, 1981, a reporter for WBBM–TV called Brown & Williamson headquarters and was put in touch with a Mr. Humber in the corporate affairs department. The reporter told Mr. Humber that he was preparing a story on the tobacco industry for Walter Jacobson's "Perspective" program and asked him about the part of the FTC staff report that dealt with the Viceroy advertising strategy. Humber replied that Brown & Williamson had rejected the proposals in the Kennan report and had fired Ted Bates in part because of dissatisfaction with those proposals.

Walter Jacobson's "Perspective" on the tobacco industry was broadcast on November 11 and rebroadcast on November 12 and again on March 5, 1982. In the broadcast, Jacobson, after stating that "pushing cigarettes on television is prohibited," announces his theme: "Television is off limits to cigarettes and so the business, the killer business has gone to the ad business in New York for help, to the slicksters on Madison Avenue with a billion dollars a year for bigger and better ways to sell cigarettes. Go for the youth of America, go get 'em guys.... Hook 'em while they are young, make 'em start now—just think how many cigarettes they'll be smoking when they grow up." Various examples of how cigarette marketing attempts "to addict the children to poison" are given. The last and longest concerns Viceroy.

The cigarette business insists, in fact, it will swear up and down in public, it is not selling cigarettes to children, that if children are smoking, which they are, more than ever before, it's not the fault of the cigarette business. That's what Viceroy is saying, "Who knows whose fault it is that children are smoking? It's not ours."

Well, there is a confidential report on cigarette advertising in the files of the Federal Government right now, a Viceroy advertising, the Viceroy strategy for attracting young people, starters they are called, to smoking—"FOR THE YOUNG SMOKER.... A CIGARETTE FALLS INTO THE SAME CATEGORY WITH WINE, BEER,

SHAVING OR WEARING A BRA...." says the Viceroy strategy— "A DECLARATION OF INDEPENDENCE AND STRIVING FOR SELF-IDENTITY." Therefore, an attempt should be made, says Viceroy, to " ... PRESENT THE CIGARETTE AS AN INITIATION INTO THE ADULT WORLD," to " ... PRESENT THE CIGARETTE AS AN ILLICIT PLEASURE ... A BASIC SYMBOL OF THE GROWING-UP, MATURING PROCESS." An attempt should be made, says the Viceroy slicksters, "TO RELATE THE CIGARETTE TO 'POT', WINE, BEER, SEX. DO NOT COMMUNICATE HEALTH OR HEALTH-RELATED POINTS." That's the strategy of the cigarette slicksters, the cigarette business which is insisting in public, "We are not selling cigarettes to children."

They're not slicksters, they're liars. *Id.* at 266.

The liability and damage issues were bifurcated with the same jury hearing the evidence on both liability and damages. Pursuant to Rule 49(a) of the Federal Rules of Civil Procedure, the jury made separate findings on the liability issues. The jury found that: (1) plaintiff proved by a preponderance of the evidence that defendants' broadcast was "of and concerning" B & W; (2) plaintiff proved by a preponderance of the evidence that defendants' broadcast was substantially false; (3) plaintiff proved by clear and convincing evidence that defendants knew the broadcast was false or recklessly disregarded whether or not the broadcast was false; and (4) defendants did not prove by a preponderance of the evidence that the broadcast was a "fair summary" of portions of a government report. After hearing evidence with respect to damages the jury awarded B & W $3 million in general damages, $2 million in punitive damages from CBS, and $50,000 in punitive damages from Jacobson.

Defendants contend that they are entitled to post-trial relief because the jury's findings and verdicts are against the manifest weight of the evidence; evidence offered by plaintiff was improperly received or evidence offered by defendants was improperly excluded; instructions tendered were improperly given or refused; defendants were precluded from asserting to the jury the defense of opinion; punitive damages are unconstitutional; and the amount of compensatory and punitive damages was excessive. Defendants request in the alternative that the court order a remittitur.

## I. LIABILITY

■ Under Illinois law, which governs in this diversity case, judgment notwithstanding the verdict is granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand." *Pedrick v. Peoria and Eastern Railroad,* 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–14 (1967); *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 285–86 (7th Cir.1982). The standard of review for a new trial is also strict. The court may not second guess a jury or substitute its view for that of the jury. *Robison v. Lescrenier,* 721 F.2d 1101, 1104 (7th Cir.1983); *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.,* 401 F.2d 23, 30 (7th Cir. 1968). All disputes concerning the reasonable inferences to be drawn from the evidence must be resolved against the moving party. The credibility of the witnesses is a matter for the jury and not for the court. *Oberman v. Dun & Bradstreet, Inc.,* 507 F.2d 349, 353 (7th Cir.1974).

To assure that the judgment does not constitute a forbidden intrusion in the field of free expression, an independent examination of the record must be made to determine whether the jury's finding of actual malice is supported by clear and convincing evidence. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Anderson v. Liberty Lobby, Inc.,* — U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

While *Bose* requires this review of the record, the *Bose* court specifically noted that "due regard" should be given to the factfinder's opportunity "to observe the demeanor of the witnesses; the constitutionally-based rule of independent review permits this opportunity to be given its due." 466 U.S. at 499–500, 104 S.Ct. at 1958–59.

Keeping these principles in mind the court must determine whether or not the evidence presented at trial supports the fact findings made by the jury.

### A. Of and Concerning B & W

■ The jury first found that the broadcast was of and concerning B & W. Though B & W was not mentioned by name in the broadcast it is admittedly the only manufacturer of Viceroy cigarettes. The name and address of B & W is on every package of Viceroy brand cigarettes. Photographs of Viceroy cigarettes were displayed on the television screen while the broadcast was underway. The broadcast concerned B & W if viewers of the broadcast reasonably understood the statement to refer to B & W. The statement need not mention B & W by name and it is not necessary that everyone who saw the broadcast actually understood the statement to refer to it. It is sufficient that persons who know B & W would understand the statement to refer to it. *Archibald v. Belleville News Democrat*, 54 Ill. App.2d 38, 203 N.E.2d 281, 283 (5th Dist. 1964). Given the evidence presented, the jury's finding that plaintiff proved by a preponderance of the evidence that the broadcast complained of was understood to be about B & W is supported by substantial evidence and is not against the manifest weight of the evidence.[1]

### B. Falsity

The jury found that plaintiff proved by a preponderance of the evidence that defendants' broadcast was substantially false.

The evidence shows that on November 11–12, 1981, Jacobson broadcast a "Perspective" on CBS's WBBM–TV station in Chicago concerning cigarette advertising. As he spoke them, those parts of Jacobson's statement that he characterized as quotations from a confidential government report purportedly dealing with Viceroy's advertising and advertising strategy were printed on the screen alongside pictures of a portion of an actual Viceroy advertisement showing two packs of Viceroy Rich Lights, a golf ball, and part of a golf club.

B & W put before the jury what the evidence showed to be every ad published by Viceroy from 1975 to 1982. The jury could reasonably have found from an examination of those advertisements that there was no pot, wine, beer and sex ad in this group. Defendants do not contend otherwise. Indeed, on cross examination defendant Jacobson admitted that he did not know of any such advertisements and that he did not believe that Viceroy ever ran such advertisements (Tr. 1246).

B & W presented the testimony of individuals with knowledge regarding Viceroy advertising and B & W's relationship with its ad agency, Ted Bates and the MARC research firm which provided the so-called Kennan report for Ted Bates and B & W. These witnesses stated that there was no strategy or plan designed to attract children to smoke by reference to pot, wine, beer and sex or any other device. Rather, they testified B & W had a policy forbidding any advertising directed to persons under 21 and that policy was in accordance with a cigarette manufacturers' code forbidding such advertising.

An exhibit not put before the jury, defendants' Exhibit 57, was a collection of proposed ads, or artists' renderings which were characterized as exploitive of a sex theme. As there was no showing that these ads had in fact been accepted or

---

**1.** The Court of Appeals opinion indicates that defendants conceded this point on appeal. *Brown & Williamson*, 713 F.2d at 267. Because defendants had not answered the complaint when the case was before the Court of Appeals, they were permitted to dispute this element at trial.

actually utilized in a Viceroy advertisement they were excluded as not probative.

Defendants sought to call Matthew Myers, a former FTC attorney who worked on and helped write the FTC report, "to have him testify as to how he reached his conclusions" to show that the FTC report was true (Tr. 958). This testimony was refused.[2] Myers' state of mind at the time he helped to write the FTC report and the truth or falsity of the FTC report are not issues in this case; it is the truth or falsity of that part of Jacobson's broadcast found to be libelous that is an issue.

■ The evidence was clearly sufficient to support the jury's finding that B & W proved by a preponderance of the evidence that the broadcast statement concerning Viceroy was substantially false.[3]

## C. Actual Malice

■ Plaintiff sought punitive as well as actual damages. Also, by virtue of its advertising and sale of cigarettes it is a public figure. *Brown & Williamson,* 713 F.2d at 273. Accordingly, B & W was required to prove "actual malice" as defined in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The jury found that plaintiff proved by clear and convincing evidence that defendants either knew the broadcast was false or recklessly disregarded whether it was false. The jury was instructed that in order to find reckless disregard of whether a statement was false there must be clear and convincing evidence to permit the conclusion that a defendant in fact entertained serious doubts as to the truth of the broadcast or was aware of its probable falsity. Consideration of this issue by a jury and the court requires careful analysis of the editorial process. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

After reading a news report in the *Lexington (Ky.) Leader,* defendants obtained an unofficial copy of an FTC report to Congress on Cigarette Advertising. The material reviewed and referred to in the FTC report was not available to defendants because it had been kept secret by the FTC.[4] Michael Radutzky, Jacobson's researcher, contacted B & W and spoke to Thomas Humber. Humber told Radutzky that no ads of the kind referred to in the FTC report were ever published and that the MARC strategy was never adopted (Tr. 665, 473–74, 665; PX 10). He also stated that the Ted Bates Advertising Agency who had commissioned the MARC report was discharged partly because of dissatisfaction with this report. Radutzky communicated this to Jacobson (Tr. 708, 1163, 1234).

Radutzky also conducted an unsuccessful search to locate Viceroy advertising that reflected the "pot, wine, beer and sex"

2. The only question as to which an objection was sustained related to the organization of the FTC. Defendants waived any objection to the exclusion of any other testimony by failing to make a proper offer of proof. Fed.R.Evid. 103(a); *Ellis v. City of Chicago,* 667 F.2d 606, 612 (7th Cir.1981). The offer of proof was to be made "by inquiring of" the witness outside the presence of the jury (Tr. 962, 963). This was not done.

3. Defendants also argue that relief should be granted because one of plaintiff's witnesses, William Scholz, a former executive at the Ted Bates advertising agency, testified that he was not being paid by plaintiff to testify, and that he was in fact paid $4,600. Scholtz testified that he would be receiving "expenses," but would not be paid anything beyond that (Tr. 309–10). When he billed plaintiff, he sought and was paid

$4,600 as an "expense" to the consulting firm, Williams Communications, where he worked, because the firm lost the revenues he would have generated during those days he testified. While the court agrees that this use of the term "expense" may be somewhat misleading, it does not justify the relief defendants seek. Although defendants argue that Scholz's testimony was critical on the issue of falsity, there was substantial evidence apart from Scholz's testimony from which a jury could have found Jacobson's broadcast to be substantially false. Defendants have not demonstrated that plaintiff engaged in misconduct nor was Scholz's testimony so central that it would require the relief sought. *See Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 832 n. 3 (7th Cir.1985).

4. The FTC report itself was a secret document until released by a Congressional Committee.

strategy. Radutzky stated that he specifically noted this failure to find such ads when he submitted a sample script to Jacobson (Tr. 631–32, 667–68, 691). Jacobson specifically directed Radutzky to find such ads (Tr. 707–08). Unable to find any such ads, defendants illustrated the broadcast with, among other things, an ad showing a pack of Viceroy cigarettes next to two golf clubs and a golf ball (Tr. 708–09). The jury could have regarded defendants' failure to find any ads corroborating the "Viceroy strategy," after inquiry and active attempts to do so, as evidence either that they knew Viceroy never adopted such a strategy or as evidence which would show reckless disregard of the truth.

There was also testimony that Radutzky destroyed parts of certain relevant research and script documents. Radutzky testified he threw away that part of his copy of the FTC Staff Report with handwritten notes relating to B & W (Tr. 602), portions of his outline (Tr. 603), his copy, Jacobson's copy and several other copies of his sample script (Tr. 684), and his contemporaneous notes of interviews with people regarding Viceroy (Tr. 560–61).

The destruction of documents while a litigation is pending can be "an admission that the introduction of such evidence would be damaging to the party not producing it." *A.C. Becken Co. v. Gemex Corp.*, 314 F.2d 839, 841 (7th Cir.), *cert. denied*, 375 U.S. 816, 84 S.Ct. 68, 11 L.Ed.2d 51 (1963). Radutzky's selective destruction of documents, containing substantial notes reflecting his research and thinking prior to the broadcast, could have led the jury to conclude that he knew the statements made in the broadcast were false or had doubts as to their truth.

■ Defendants argue that the selective document destruction evidence should not have been admitted because B & W failed to show as a preliminary matter that the destruction was in bad faith. *See Coates v. Johnson & Johnson*, 756 F.2d 524, 550–51 (7th Cir.1985); *S.C. Johnson & Son, Inc. v. Louisville & Nashville Railroad Co.*, 695 F.2d 253, 258–59 (7th Cir.1982). The Seventh Circuit stated the general rule in *S.C. Johnson:*

> It is elementary that if a party has evidence ... in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable. *However ... it must appear that the party had some reason to suppose that nonproduction would justify the inference ... the totality of the circumstances must bring home to the nonproducing party notice that the inference may be drawn.*

695 F.2d at 259 (quoting *Commercial Insurance Co. of Newark v. Gonzalez*, 512 F.2d 1307, 1314 (1st Cir.), *cert. denied*, 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (1975) (emphasis added by Seventh Circuit)). Thus the "totality of the circumstances" must demonstrate that Radutzky destroyed his notes and other documents in bad faith.

Radutzky knew that the present case had been brought against CBS and Jacobson. He learned of the lawsuit in March, 1982, shortly after it was filed. CBS had a retention policy that provided:

> Once the station is notified of a claim pertaining to any of the following material, the litigation section of the Law Department should be notified and any and all related materials should be retained until specifically released.

> Some materials are retained indefinitely on a selected basis. Our policy is to review the files in January to determine what should be selectively retained. Obviously if there is a ... pending legal action, our policy is to retain all pertinent materials unless specifically released by the Law Department.

Radutzky testified that he was kept informed about the case by lawyers (Tr. 558) and that he only destroyed the documents when he heard that the case was dismissed (Tr. 623); that he did not know that the dismissal was being appealed (Tr. 624); and that he was only housecleaning when he threw those documents away (Tr. 758–59).

However, Radutzky admitted he was not given permission by the CBS attorneys to

destroy documents (Tr. 560). The notice of appeal from the dismissal was filed only six days after the motion to dismiss was granted. Although Radutzky denied knowing about CBS's retention policy, his emphasis on destroying the documents only after learning of the dismissal would indicate he understood that documents should not be destroyed while litigation is pending.

Radutzky testified he "gathered up the notes that [he] had taken on the cigarette series as well as a bunch of other notes ... and [he] used that opportunity to just clean house, as it were, and relieve overflowing files." (Tr. 758–59). This explanation implies a wholesale, nonselective process. But only part of the copy of the FTC report with Radutzky's handwritten notes in the margins was destroyed—the first five of ten pages were destroyed and the others were not (Tr. 586–87, 591).

Radutzky made an original and six or seven copies of his "sample script," one of the documents destroyed, and distributed them to Jacobson and other CBS executives (Tr. 685–86). Yet not one of these copies could be found, and Radutzky did not claim to destroy documents in the possession of anyone other than Jacobson and himself.

The jury could reasonably find, based on the totality of the circumstances, that Radutzky's destruction of documents was in bad faith, justifying an inference that the documents were damaging to defendants' case. The jury could conclude that the contents of these documents would indicate serious doubt, or more, on the part of Radutzky, as to the truth of the broadcast.[5]

There was also evidence submitted that the broadcasts at issue were aired during a "sweeps" period, a period when the number of viewers watching different television stations is monitored. The ratings obtained during sweeps were important to CBS and WBBM (Tr. 814, 1041, 1045–49; PX 30). There was evidence that defendants wanted exciting news stories during the sweeps period (PX 16). A jury could reasonably infer that the timing of the broadcast during "sweeps week" might give defendants a stronger motive to air this broadcast, even if they had doubts about its content. The importance of "sweeps week" was a relevant part of the editorial process proof.

Defendants' evidence on the issue of actual malice consisted of the testimony of Jacobson and Radutzky as to their state of mind at the time of the broadcast. They testified that they believed the statements made to be true and that they did not have doubts as to that truth. However, there were instances of inconsistency in their testimony that posed questions of credibility for the jury. For example, Jacobson, testifying that he remembered specific details surrounding his writing of the Perspective script at issue, directly contradicted his earlier deposition testimony that he had no memory of the matter (Tr. 1280–1299).

There is also the following testimony by Jacobson in response to a question by defendants' attorney:

Q When you sat down to write this Perspective, and then when you got on the air and delivered it, did you intend to inform your viewers that Viceroy was actually running advertising that contained pot, wine, beer and sex?

A No, no way, I didn't say it. I didn't think it.

I was reporting on the Federal Government report. I took quotes from the report. And I put the quotes on the air. And I was not making a statement whatsoever about advertisements, certain advertisements that might have been implemented. I was simply saying what the report said, that this was a Viceroy strategy, that this strategy might have been there for ten years, 20 years, two years, or whatever.

(Tr. 1246–47).

B & W contends that this statement constituted an admission by Jacobson that he

---

5. Plaintiff's proposed instruction on the implication of document destruction was refused.

Rather the matter was one for argument by the parties to the jury.

knew at the time of the broadcast that B & W never ran any advertisements related to pot, wine, beer, and sex and therefore an admission of actual malice. Defendants argue that this statement is not an admission of actual malice because Jacobson never said in the broadcast that Viceroy ran any such advertisements; all Jacobson said in the broadcast, they contend, was that Viceroy had "a strategy." Furthermore, defendants argue that even if the broadcast could have been interpreted as a statement about "pot, wine, beer, and sex" advertisements, his testimony reveals that this was an unintended interpretation reflecting at most the inadvertent choice of misleading language, and actually proves that Jacobson lacked the requisite knowledge that his statements were false.

However, the jury could have rejected Jacobson's testimony that he did not intend to communicate a message about actual Viceroy advertising. The theme of the broadcast was cigarette advertising. The statements made in the broadcast relating to the "Viceroy strategy" were made in the context of explaining why so many children take up smoking. The statement was made by Jacobson that television advertising of cigarettes is off limits; so the "killer business has gone to Madison Avenue with a billion dollars a year for bigger and better ways to sell cigarettes." Just prior to describing "the Viceroy strategy," Jacobson stated in the broadcast:

> The cigarette business insists, in fact, it will swear up and down in public, it is not selling cigarettes to children, that if children are smoking, which they are, more than ever before, it's not the fault of the cigarette business. "Who knows whose fault it is?" says the cigarette business. "Who knows whose fault it is that children are smoking? It's not ours."

713 F.2d at 266 (reciting the broadcast). Jacobson immediately goes on to describe "a Viceroy *advertising,* the Viceroy strategy for attracting young people, starters they are called, to smoking." The reference to "Viceroy advertising" and "the Viceroy strategy" at that point can be understood as demonstrating how and why

children begin smoking, and that it was Viceroy's fault (at least as one advertiser).

A "strategy" that was not implemented, that was nothing more than a report in a drawer, could not explain why children smoke. Only advertising that children see can persuade them of anything. Jacobson finished his broadcast:

> An attempt should be made, says the Viceroy slicksters, "TO RELATE THE CIGARETTE TO 'POT,' WINE, BEER, SEX. DO NOT COMMUNICATE HEALTH OR HEALTH-RELATED POINTS." That's the strategy of the cigarette slicksters, the cigarette business which is insisting in public, "We are not selling cigarettes to children."
>
> They're not slicksters, they're liars.

*Id.* Jacobson stated that the cigarette companies were liars because they were in fact selling cigarettes to children. And the clear message is that Viceroy was doing this through the use of its advertising that relates the cigarette to pot, wine, beer, and sex.

In its opinion in this case, the Seventh Circuit found the broadcast to be libelous per se and described the message of the broadcast to be that of "[a]ccusing a cigarette company of what many people consider the immoral strategy of enticing children to smoke—enticing them *by advertising* that employs themes exploitive of adolescent vulnerability ..." 713 F.2d at 268 (emphasis added). Elsewhere in the opinion the Seventh Circuit summarized the broadcast:

> The Jacobson broadcast conveys the following message: Brown & Williamson *currently is advertising cigarettes* in a manner designed to entice children to smoke by associating smoking with drinking, sex, marijuana, and other illicit pleasures of youth."

*Id.* at 271 (emphasis added). The broadcast could be interpreted by any average viewer/listener [the jury] just as the Seventh Circuit describes it—as describing actual Viceroy advertising relating cigarettes to various "illicit pleasures."

Defendants argue that even if the broadcast can be interpreted that way, that interpretation was unintended by Jacobson, and Jacobsons' belief that it would be understood as referring only to a "paper strategy" and not actual advertising demonstrates the absence of actual malice, citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose,* the defendant published an article evaluating several brands of loudspeakers, including one marketed by the plaintiff. The article included the statement: "Worse, individual instruments heard through the *Bose* system ... tended to wander about the room." 466 U.S. at 488, 104 S.Ct. at 1953. The district court found that this was a false statement of fact because instruments heard through the speakers tended to wander "along the wall" rather than "about the room." It also found that defendant had published this false statement with actual malice based on the state of mind of the engineers who supervised the test and wrote the report.

The Supreme Court, affirming the First Circuit's reversal of the district court, held that actual malice had not been demonstrated by clear and convincing evidence. The Court stated:

> [A]doption of the language chosen was "one of a number of possible rational interpretations" of an event "that bristled with ambiguities" and descriptive challenges for the writer.... The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.

466 U.S. at 512–13, 104 S.Ct. at 1966–67.

This case, however, is factually quite different from *Bose.* Unlike the "malapropism" involved in *Bose,* the statement made by Jacobson is a powerful statement indicting the cigarette industry and Viceroy in particular. It communicates the message that Viceroy was using actual advertisements to hook children on cigarettes.

The evidence was such that the jury could have found it incredible that Jacobson gave this impression inadvertently. Jacobson is a veteran newsman and commentator who writes hundreds of "Perspective" scripts each year. The impression given by Jacobson is not the result of one word, as it was in *Bose,* involving the relatively subtle distinction between "about" and "along"; it is the result of the cumulative effect of the entire broadcast. The entire broadcast dealt with methods *actually used* by the cigarette industry to entice children to smoking, such as advertising in popular movies and distributing cigarettes on the street. The visual portion of the broadcast included pictures of cigarettes being distributed to young people on the street. Defendants admitted that this footage was taken from its archives and that Viceroy cigarettes were not being distributed. Since the evidence does not support a conclusion that Jacobson inadvertently sent the message that B & W was actually using such ads, Jacobson's testimony that he did not think at the time he wrote the Perspective that B & W was running such ads constitutes an admission on the issue of actual doubt or reckless disregard of the falsity of the broadcast.

■ Based on a review of the record, there was clear and convincing evidence to support the jury's finding that defendants published a libelous statement with actual malice.

Defendants also object to certain rulings regarding evidence and to certain of the court's jury instructions on the issue of actual malice, as follows:

■ (1) Defendants argue that the term "reckless disregard" should not have been used to instruct the jury on the required state of mind because it suggests an objective rather than a subjective standard. However, the court instructed the jury:

> In order to find a defendant recklessly disregarded whether a statement was false, there must be clear and convincing evidence to permit the conclusion that a defendant *in fact entertained serious doubts* as to the truth of the broadcast or was aware of its probable falsity.

Broadcasting *with such doubts or awareness* shows reckless disregard of falsity. (Tr. 1573 (emphasis added)). This instruction clearly employs a subjective standard consistent with *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), and in fact tracks the language of that case. *Id.* at 731, 88 S.Ct. at 1325.

■ (2) Defendants argue that the court should have instructed the jury on the meaning of the words "clear and convincing" as used in setting the quantum of proof required to establish actual malice. The comments appended to the Illinois Pattern Jury Instructions discourage such elaborations and this court, sitting in diversity, follows that direction. *See Illinois Pattern Jury Instructions*, Comments to No. 21.01 and 21.06 (2d ed. 1971). Similarly, the Seventh Circuit has wisely cautioned against defining terms such as "reasonable doubt." *See* Federal Criminal Jury Instructions of the Seventh Circuit, No. 2.07 (and cases cited therein) (1980). Just as the Seventh Circuit Committee found the phrase "reasonable doubt" to be self-explanatory and its own best definition, so too the words "clear and convincing" are self-explanatory and need no further explanation.

■ (3) Defendants argue that it was error to admit evidence of the CBS news standards. It was initially ruled that advisory standards were inadmissible as not directly related to defendants' actions with regard to the particular broadcast at issue. At trial, however, defendants' examination of a CBS witness on the subject of his opinion of the fairness and accuracy of the Perspective opened the door for this evidence. Defendants pursued this line of questioning despite warnings that such testimony would subject him to cross-examination concerning CBS standards which in a deposition he admitted were violated by the Jacobson broadcast (Tr. 980–81, 1004–06, 1012, 1027–29). Because defendants

presented opinion evidence of the general fairness of the Perspective, plaintiff was entitled to attempt to show that the Perspective violated certain CBS standards as the witness had stated in a deposition.

■ (4) Defendants argue that they were erroneously prevented from introducing evidence regarding research done concerning other parts of the Perspective not involving Viceroy advertising in order to show how carefully the defendants put the Perspective together. Defendants argued during trial that they should be entitled to show that they carefully researched the other segments of Perspective, involving Merit and Marlboro cigarettes, since the entire Perspective was shown to the jury (Tr. 1111–1116). But plaintiff was prepared to stipulate that there were no issues as to those other segments of the Perspective (Tr. 1116–17). Therefore defendants' actions with regard to those other segments were not at issue. That evidence was not relevant to the issues in the case and would have protracted the already complicated trial.

■ (5) Defendants argue that evidence relating to the so-called "sweeps" period,[6] including PX 16 (indicating certain desirable common denominators of pieces to be run during sweeps), and PX 17 and 18 (the ads advertising the Jacobson Perspective on cigarette advertising) was irrelevant. Even if that evidence showed defendants had a heightened desire at that time for dramatic subject matter that would produce a larger viewership, higher ratings, and, thereby, increased advertising revenues, argue defendants, that does not evidence a lessened concern for the truth. But it is possible that if defendants anticipated a heightened benefit from the broadcast due to sweeps, they would be more likely to run that story in spite of doubts about the truth of the story and despite the *same* level of concern for the truth. As stated in *Herbert v. Lando, supra*, 441

---

6. At certain periods of the year, including the time of the Jacobson broadcast, surveys are made of the number of program viewers. The CBS news program was number one in the survey, relative to other news shows.

U.S. at 165, 99 S.Ct. at 1643, "[c]ourts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant...." As evidence of a strong motive—independent of truth—to broadcast, the "sweeps" evidence was relevant to defendants' state of mind.

■ Defendants also argue that the "sweeps" denominators lacked proper authentication and should have been excluded for that reason as well. Federal Rule of Evidence 901(a) states that "[t]he requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponents claim." PX 16 was produced by defendants from their files and dealt with a subject familiar to CBS employees and specifically relevant to the broadcast period. This was sufficient. *Burgess v. Premier Corp.*, 727 F.2d 826, 835 (9th Cir. 1984).

### D. Fair Summary

■ The jury found that defendants did not prove by a preponderance of the evidence that the broadcast was a "fair summary" of portions of the Federal Trade Commission's Staff Report on the cigarette advertising investigation. Defendants now ask the court to set aside the jury's finding. But there is no basis for granting either judgment n.o.v. or a new trial on this issue.

■ First, the Seventh Circuit addressed this issue of fair summary and stated:

> The FTC staff report conveys the following message: six years ago a market-research firm submitted to Brown & Williamson a set of rather lurid proposals for enticing young people to smoke cigarettes and Brown & Williamson adopted many of its ideas (though not necessarily the specific proposals quoted in the report) in an advertising campaign aimed at young smokers which it conducted the following year. The Jacobson broadcast conveys the following message: Brown

& Williamson currently is advertising cigarettes in a manner designed to entice children to smoke by associating smoking with drinking, sex, marijuana, and other illicit pleasures of youth. So at least a rational jury might interpret the source and the summary, and if it did it would be entitled to conclude that the summary carried a greater sting and was therefore unfair.

713 F.2d at 271–72. The Seventh Circuit plainly held that the issue of fair summary was for the jury. This court will not disturb that holding.

Defendants argue that this court is not bound by the Seventh Circuit's opinion on this issue because it was rendered in the context of an appeal from the granting of a motion to dismiss and was not based on the fully developed record presented at trial. That is true, but it makes no difference. The Seventh Circuit held the issue was for the jury by looking solely at the face of the FTC report and the words of Jacobson's broadcast. Neither of those have changed between then and now.

Even if this court were not bound by the Seventh Circuit's opinion, there is no basis for disturbing the jury's finding. As the Seventh Circuit's opinion shows, the most important evidence in deciding this question are six pages from the FTC report and the broadcast itself.[7] The Seventh Circuit's analysis reflected a comparison of these documents; little else was brought out at trial on this issue that would affect such an analysis. "An unfair summary ... is one that amplifies the libelous effect that publication of the government report verbatim would have on a reader who read it carefully—that carries a 'greater sting.'" *Brown & Williamson*, 713 F.2d at 271 (quoting *Tunney v. American Broadcasting Co.*, 109 Ill.App.3d 769, 776, 65 Ill.Dec. 294, 298, 441 N.E.2d 86, 80 (1st Dist.1982)). There are several differences between the FTC report and the broadcast that would allow a jury to find that the one was not a fair summary of the other. These include:

7. The six pages from the FTC report are attached as Appendix A to this opinion.

1. The broadcast used the present tense to represent that the tactics were currently being used while the FTC staff report indicated that the quoted language came from a report written six years earlier.

2. The broadcast implied that the quotations from the MARC report came directly from B & W while the FTC staff report clearly indicated that they were from the MARC report made to an advertising agency.

3. The broadcast used the terms "children" to refer to the object of this strategy, while the report used the terms "young smokers" and "starters."

4. The report did not cite any published Viceroy advertisement that implemented a pot, wine, beer or sex strategy to attract children to smoke cigarettes. The broadcast clearly implied such ads existed.

Based on these changes by defendants, a rational jury could find that the broadcast had a "greater sting" than the FTC staff report.

 Defendants also argue that other newspaper articles viewed by Radutzky that discussed the FTC staff report should have been admitted on the issue of fair summary. The jury was instructed that they could consider those documents as evidence on the issue of actual malice but not on the issue of fair summary (Tr. 1574–75). Defendants argue that these articles would serve as the "appropriate measure" by which the jury could "distinguish the heightened 'defamatory sting' that alone can defeat the fair summary privilege from the heightened impact inherent in a summary." (Defendants' Memorandum in Support at 56). But defendants' argument is premised on incorrect assumptions about both the test to be applied and the nature of the evidence they would have the jury consider. To determine whether the broadcast was a fair summary or not, the jury was required to determine whether the

broadcast carried a "greater sting" than the FTC staff report. 713 F.2d at 271. The term "greater" implies a comparison—a direct comparison—between the two statements. It does not, moreover, require some minimum, quantifiable degree of "incremental sting." Defendants' argument implies that some degree of heightened defamatory sting—presumably the heightened sting contained in the newspaper articles—is tolerated by the test and is consistent with a "fair summary." The test does not support this interpretation. The test does not require the jury to "measure" the greater sting and compare that quantity to some objective standard. To do so would be not only inconsistent with the test, but would be impractical and confusing.

Defendants' argument also presumes that the newspaper articles that defendants would have had the jury consider are themselves fair summaries but that was not self-evident. That issue was not before the court and was never decided. There is no reason to assume that a jury, when faced with the issue, might not find the newspaper articles to carry the requisite "greater sting" and to be "unfair." This problem also points up the impracticality of defendants' proposed interpretation of the test—where does one find a measure of "acceptable" heightened "sting" or "impact," and how many trials-within-the-trial will be needed to establish that minimum? The newspaper articles were properly excluded on the issue of fair summary.

 Defendants also argue the jury should have been instructed that plaintiffs had to prove by clear and convincing evidence that defendants either knew their summarization was unfair or seriously doubted its fairness. Defendants would thereby add the element of actual malice as applied to the process of summarization and would place the burden of proving that the summary was not fair on the plaintiff.[8]

8. This issue is, of course, distinct from the question of whether the issue of fair summary survives a finding of actual malice *as to the falsity*

*of the statement itself.* That issue was addressed by the Seventh Circuit but left undecided. 713 F.2d at 272–73. It is now moot since the jury

Defendants cite no cases in support of this theory. They rely only on language from Restatement (Second) of Torts § 611 comment b (1977), which they contend supports their argument.[9] Defendants contend that the Illinois Supreme Court adopted § 611 in *Catalano v. Pechous*, 83 Ill.2d 146, 50 Ill. Dec. 242, 419 N.E.2d 350 (1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). However, although the court in *Catalano* discussed § 611 and comment a, it could hardly be said to have adopted comment b. *See Brown & Williamson*, 713 F.2d at 272 (observing that although § 611 implied the fair summary privilege was not forfeited by actual malice as to the truth or falsity of the statements, *Catalano* appeared to have treated the question as open). Moreover, the issue of fault or burden of proof regarding the summarization process was not discussed at all in *Catalano*, and it is incorrect to assert that the Illinois Supreme Court, by discussing § 611 as to one aspect of the privilege, adopted it as to all aspects and issues touched on by the comments to that section. The privilege of fair summary is an affirmative defense which a defendant must prove by a preponderance of the evidence. *Welch v. Chicago Tribune Co.*, 34 Ill.App.3d 1046, 340 N.E.2d 539, 543 (1st Dist.1976); *Fleck Bros. Co. v. Sullivan*, 423 F.2d 155, 157 (7th Cir.1970); Restatement (Second) of Torts § 613(2).

Recent cases dealing with the Illinois fair summary privilege establish an objective test under which the privilege is forfeited if it is inaccurate or unfair—if it contains a "greater sting" than the report on which it is based. *Brown & Williamson*, 713 F.2d at 271; *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 535 n. 12 (7th Cir.1982). Defend-

ants' additional proposed malice requirement (which they would cast on the plaintiff) was expressly rejected by the Illinois Appellate Court. *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735, 47 Ill.Dec. 429, 441–42, 415 N.E.2d 434, 448–49 (1st Dist.1980).

The privilege of fair and accurate summary of government proceedings and reports is grounded in the common law and is not based on the First Amendment. *Brown & Williamson*, 713 F.2d at 270. Defendants have not argued otherwise. It is inconsistent to argue that the First Amendment requires a higher test to defeat a privilege not required by the Constitution in the first place. A summary that objectively carries a "greater sting" than the report it summarizes loses the protection of this privilege under Illinois law. It is not required that *plaintiff* prove defendants knew their broadcast was unfair or inaccurate or that they seriously doubted its fairness and accuracy. The burden is rather on the defendants to prove that they made a fair summary in order to invoke the privilege. The jury's determination that defendants failed to prove the defense of fair summary cannot be set aside.

*E. Opinion*

This court ruled prior to trial that the last sentence of the broadcast—"They're not slicksters, they're liars"—is a statement of fact and not a statement of protected opinion. *Brown & Williamson v. Jacobson*, No. 82 C 1648, slip op. (N.D.Ill. March 14, 1985) [Available on WESTLAW, DCTU database] (denying defendants' motion for summary judgment). Defendants now argue (1) that the ruling of March 14, 1985 was incorrect and (2) that it was erroneously "extended" to apply to the rest of

found that the defendants did not prove that the broadcast was a fair summary.

**9.** Comment b states, in part:
The privilege stated in this Section [to report on official proceedings or public meetings] permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory

statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement. The distinction as to the measure of fault [as between cases involving public figure plaintiffs and cases involving private person plaintiffs] is applicable to the requirement of fault for this purpose, too.

the broadcast "without giving defendants an opportunity to be heard on the issue." (Defendants' Memorandum in Support at 27).

### 1. "They're not slicksters, they're liars."

 The distinction between fact and opinion is a matter of law. *E.g., Ollman v. Evans,* 750 F.2d 970, 978 (D.C.Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). To determine whether a statement is fact or opinion, a court must evaluate the totality of the circumstances and should consider these factors:

(1) Whether the statement has a precise core of meaning for which a consensus of understanding exists, or whether the statement is indefinite and ambiguous.

(2) Whether the statement is capable of objective verification as true or false.

(3) Considering the full context of the statement (the entire broadcast), will the average person infer that the particular statement has a factual context? Was cautionary or opinion wording used?

(4) Does the broader context or setting in which the statement appears signal the likelihood of the statements being either fact or opinion?

*Ollman,* 750 F.2d at 979.

 Examined according to these criteria, the statement—"They're not slicksters, they're liars"—is a statement of fact and not opinion. The assertion that B & W is a "liar" has a precise core of meaning; it meant that B & W falsely denied using the kind of advertising described in Jacobson's broadcast. The statement is capable of objective verification; by determining whether B & W did use such advertising or not, one could also determine whether it lied when it denied doing so. In the context of the entire broadcast, the average person would infer that the statement had a factual context; Jacobson used the rest of the broadcast to purportedly explain to the public how B & W and other cigarette manufacturers did in fact advertise to attract children.

By presenting the rest of the broadcast as essentially factual material, the average person would infer that the statement accusing B & W of lying had a factual context. No cautionary or opinion wording was used. The only factor arguably favoring defendants' position is the last one—Jacobson did shift to the "Perspective corner" in order to make this broadcast. The precise nature of a "Perspective" is still far from clear. It is not, however, an "editorial" that is said to "reflect the views of the station" or of Jacobson. When considered together with the other factors, the totality of the circumstances demonstrates that Jacobson's concluding statement was one of fact and not opinion. *See also Costello v. Capital Cities Media, Inc.,* 111 Ill.App.3d 1009, 67 Ill.Dec. 721, 726, 445 N.E.2d 13, 18 (5th Dist.1982) (accusing someone of being a liar is a factual assertion "when the derogatory remark is laden with factual content"); *Buckley v. Littell,* 539 F.2d 882, 895–96 (2d Cir.1976); *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977).

Defendants' statement that plaintiff is a "liar" is distinguished from the insulting terms found to be opinion in *Spelson v. CBS, Inc.,* 581 F.Supp. 1195 (N.D.Ill.1984), *aff'd without published opinion,* 757 F.2d 1291 (7th Cir.1985), for the same reasons that make defendants' statement one of fact in the first place. Unlike the accusation that one has lied about a particular, verifiable matter, terms like "quack," "unethical," "unprofessional," "inhuman," or "totally worthless," do not have "a precise core of meaning for which a consensus of understanding exists." They are not "capable of objective verification as true or false." Defendants misapprehend the issue when they argue that defendants' statement is opinion because the terms "slicksters" and "liars" are "tame by comparison" to the terms in *Spelson.* The determination does not depend on the degree to which the statement insults. *See Ollman, supra,* 750 F.2d at 980 ("A classic

example of a statement with a well-defined meaning is an accusation of a crime.").

■ Defendants also argue the Illinois "innocent construction rule" required the jury to decide the fact/opinion issue. Plaintiff disagrees, but this court need not decide whether the innocent construction rule applies, as a matter of Illinois law, to the opinion/fact issue. It is well established that a federal trial court follows the federal rule, when it differs from the state rule, as to whether the court or the jury decides a particular issue. *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 533–40, 78 S.Ct. 893, 898–902, 2 L.Ed.2d 953 (1958); *Herron v. Southern Pacific Co.*, 283 U.S. 91, 94–96, 51 S.Ct. 383, 384–85, 75 L.Ed. 857 (1931). This is true whether the federal rule requires that an issue be decided by the court (*Herron*) or the jury (*Byrd*).

■ The federal rule requires the court to decide, as a matter of law, whether a statement is one of fact or opinion. *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985); *Ollman, supra*, at 978;[10] *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193, 196 n. 6 (8th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Lewis v. Time Inc.*, 710 F.2d 549, 553 (9th Cir. 1983); *Rinsley v. Brandt*, 700 F.2d 1304, 1309 (10th Cir.1983). Therefore, even assuming that an Illinois state court would have submitted the opinion/fact question to the jury,[11] this court properly decided the question as one of law.

### 2. Treatment of Opinion Ruling at Trial

Defendants also argue that the court erred by "extending its holding" that the last statement in the broadcast was factual to the entire broadcast. Defendants' argument is based on an exchange that took place while counsel for defendants was examining Jacobson. Jacobson had just described how he had left his desk as an anchorman on the night of the broadcast and had gone to the "Perspective corner" to give the "Perspective" on cigarette advertising, and how there were "clear definitions" between the "Perspective" and the "news" (Tr. 1221–22). Then the following exchange took place:

> MR. LONDON [plaintiff's counsel]: Your Honor, I move to strike the answer. It is full of material about why he did it, about dividing lines so that he could go to this corner, about commentary and opinion. The question was what he did and not why he did it. The whole question of opinion has been ruled out of this case. I respectfully request that the answer be stricken and the witness be again asked to please answer only the question asked so that we will not have inadmissible material coming before the jury.

> THE WITNESS: I am answering the question, sir, I was asked.

> THE COURT: Sir, please.

> MR. MORSCH [defendants' counsel]: Your honor, could I make just one short response to that?

> THE COURT: Yes.

> MR. MORSCH: The question of opinion has not been ruled out of the case.

> THE COURT: Sir, I beg to differ with you. I have ruled that it is not a matter of opinion, and I must now tell the jury that I have so ruled, that the issues in this case are fact not opinion. Otherwise, the objection is overruled. The answer may stand.

**10.** Defendants point to footnote 18 in *Ollman* as if to suggest that *Ollman* recognizes an exception to this rule. But footnote 18 addresses the difference between *what* its test does and *what* the Illinois innocent construction rule does, and not *when* each is to be applied.

**11.** Even under the Illinois "innocent construction rule," this statement would be found to be a statement of fact by the court. The innocent construction rule, if it applied at all, would require submitting the question to the jury only if a court first found, as a matter of law, that the statement could "reasonably be interpreted" as a statement of opinion. *Chapski v. Copley Press*, 92 Ill.2d 344, 352, 65 Ill.Dec. 884, 888, 442 N.E.2d 195, 199 (1982). Jacobson's final sentence cannot reasonably be so interpreted.

(Tr. 1223). Morsch then proceeded to question Jacobson on the use of a "teleprompter" and no further discussion was had on the issue of opinion at that time.

Defendants now argue that by its response to Morsch, the court "extended" its holding as to opinion from the last statement in the broadcast—"they're not slicksters, they're liars"—to the entire broadcast. The suggestion by defendants during trial that opinion was still an issue in the case was a surprise. To understand why requires a review of some of the proceedings. On January 4, 1985, defendants moved for summary judgment, arguing (1) that there was no genuine issue as to actual malice and (2) that defendants' last statement was opinion and therefore absolutely protected under the First Amendment. Defendants clearly limited their opinion argument to the final sentence of the broadcast. Since any statements found to be opinion would be privileged, defendants' decision to argue opinion only as to the last sentence of the broadcast clearly implied that they conceded the rest of the broadcast to be statements of fact. Defendants filed their trial brief on January 22, 1985, in which they discussed each of their defenses in turn. The discussion of the opinion defense consisted of the following paragraph:

> The Cigarette Advertising Perspective contains both statements of fact and statements of opinion. The statements of fact contained in the Perspective are privileged as a fair summary of the FTC Staff Report [citing to another section of the trial brief]. To the extent that defendants' statements—even if viewed as provocative, controversial, or unfair—were statements of opinion based on facts disclosed in the broadcast, they too are absolutely privileged. *See* Defendants' Motion for Summary Judgment.

Thus defendants' trial brief reinforces the implication in their motion for summary judgment that they conceded the rest of the broadcast (other than the last sentence)

to be statements of fact. The trial brief referred the court to their motion for summary judgment on the issue of opinion, which in turn limited the argument on opinion to Jacobson's final sentence. When the court ruled on March 14, 1985 that the final sentence was a statement of fact and not of opinion, it believed it had ruled on any opinion contention in this case. Therefore, when counsel for defendants stated on the eighth day of trial that "[t]he question of opinion has not been ruled out of the case," the court disagreed.

■ Defendants' failure to argue in their January, 1985 motion for summary judgment that other parts of the broadcast were opinion arguably would not preclude them from raising such an issue to the court at a later date if it had been preserved in the final pretrial order or defendants' trial brief. It was not.[12]

Defendants' argument that the court's statement at trial regarding opinion prejudiced them and somehow requires granting the relief they seek in these post-trial motions fails for two additional reasons. First, as already discussed, the question of whether a statement is of fact or opinion is one of law. Therefore the defendants would in no event have been able to submit the issue of opinion to the jury. Second, defendants' motion is for judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) and, alternatively, for a new trial pursuant to Fed.R. Civ.P. 59. Defendants failed to preserve the issue of opinion under either Rule 50(b) or Rule 59.

■ Since a motion for judgment notwithstanding the verdict is technically only a renewal of the motion for a directed verdict made at the close of the evidence, it cannot assert a ground that was not included in the motion for a directed verdict. *E.g., Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 387 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985); *Ebker v. Tan Jay Int'l, Ltd*, 739

---

12. In their summary judgment memorandum, page 38, defendants stated that "[t]he question whether a given statement is a factual assertion or a protected opinion is one of law to be decided by the Court."

F.2d 812, 814 (2d Cir.1984). Defendants did move for a directed verdict on liability, both at the end of the plaintiff's evidence and at the conclusion of all the evidence on liability. On neither of these occasions did defendants raise the issue of opinion.

Defendants also move, in the alternative, for a new trial. A party may not seek a new trial on the basis of a theory not urged at the trial. *E.g., Grumman Aircraft Engineering Corp. v. Renegotiation Board,* 482 F.2d 710, 721 (D.C.Cir. 1973); *reversed on other grounds,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975); *Echevarria v. United States Steel Corp,* 392 F.2d 885, 892 (7th Cir.1968); *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224, 244 (N.D.Ill.1976). Defendants never properly raised the issue of opinion at trial.

Even now, in their motion for judgment notwithstanding the verdict, defendants do not indicate precisely what parts of the broadcast are opinion and what parts are fact.[13] Defendants did not preserve any unresolved issue of opinion for consideration in their motion for judgment notwithstanding the verdict or motion for a new trial.

Even if defendants had preserved that issue, the other part of the broadcast relating to plaintiff were statements of fact. In summarizing the relevant part of the broadcast, the Seventh Circuit found that it conveyed the following message:

> Brown & Williamson currently is advertising cigarettes in a manner designed to entice children to smoke by associating smoking with drinking, sex, marijuana, and other illicit pleasures of youth.

713 F.2d at 271. The relevant part of the broadcast is factual in nature—it describes *what B & W is doing.*

### F. Closing Arguments

Defendants complain of plaintiff's use of some of the rhetoric from the broadcast in its closing argument. If defendants had wanted these phrases excised from the proceedings, they should at some time have asked the court to do so. They never did.

Defendants contend that plaintiff improperly argued that parts of the broadcast referred to plaintiff when they did not and improperly personalized the remarks. However, "[i]n the absence of objection and the giving to the trial court an opportunity to attempt to correct any harm by a curative instruction, [it is] assumed that the jury had the ability to separate inflammatory and emotional rhetoric from the relevant facts in the case." *Gonzalez v. Volvo of America Corp.,* 752 F.2d 295, 298 (7th Cir. 1985).

### G. Instruction on "Corporate Defamation"

Defendants argue that the court improperly refused defendants' proposed instruction to the effect that plaintiff could recover only for defamatory statements accusing it of fraud, mismanagement, or financial instability. In its opinion in this case, the Seventh Circuit addressed that argument and held that no such limitation existed under Illinois law. The court stated:

> [T]his court's statement in *Continental Nut [v. Robert L. Berner Co.,* 345 F.2d 395] that the plaintiff had to show "fraud, mismanagement, or financial instability" was an effort to summarize the types of defamation to which corporations are susceptible, rather than an assertion, without any basis in Illinois law, that corporations are disfavored plaintiffs in defamation cases. A corporation ... can have a reputation for adhering to the moral standards of the community in which it sells its products and if that reputation is assailed in a fashion likely to harm the corporation seriously, the corporation has been libeled under Illinois law.

713 F.2d at 269. This court is bound by that holding.

---

**13.** Defendants suggest that particular *"phrases like* 'the killer business,' 'the slicksters on Madison Avenue,' 'go to the youth of America,' and 'the Viceroy slicksters' were expressions of Mr. Jacobson's opinion." Defendants' Memorandum in Support at 32–33 (emphasis added). But they do not make it clear *exactly* what parts of the broadcast they contend are opinion.

## II. DAMAGES

After a separate trial on damages, the jury awarded plaintiff three million dollars in compensatory damages, two million dollars in punitive damages against CBS and fifty thousand dollars in punitive damages against Jacobson. Defendants move for judgment notwithstanding the verdict, a new trial on damages, or a remittitur, on the grounds that the damage award was wholly unsupported by the evidence and the result of passion and prejudice.

### A. Compensatory Damages

B & W alleged in its complaint that it had been injured as a result of the tendency of defendants' statements to undermine its "reputation for honesty and to decrease its sales" and to destroy the "value of its investment in Viceroy advertising between 1978 and 1981." Plaintiff sought "actual damages in an amount to be proved at trial," punitive damages, and a declaration that the statements made were false.

Defendants argue that there was no proof of any actual injury to plaintiff, such as would justify an award of substantial compensatory damages. Plaintiff's evidence during the damages phase of the trial consisted of the following:

(1) B & W's general counsel testified that after the broadcast there were calls from the field sales force indicating that their contacts were asking "how in the world could Brown & Williamson have done such a thing."

(2) A department sales manager for B & W in the Chicago area, testified that after the broadcast he received calls from sales managers in the Chicago area reporting that they had received negative comments from distributors, retailers and consumers. He testified that the sales staff was disrupted by questions from retailers and consumers. He could not testify as to how much time was lost. He testified that some sales employees were very concerned about the company's reputation, but he was unaware of anyone who resigned. He could not testify to any lost sales.

(3) A representative of a cigarette distributor in the Chicago area testified that he spoke with persons in the tobacco industry who told him that the broadcast would not be helpful to the industry. He could not testify, however, that the sale of Viceroys suffered as a result of the broadcast, or that his own distributorship lost a single customer.

(4) The former vice-president of marketing and senior vice-president of B & W, testified that his son saw the broadcast and reported it to him by phone and that he was personally distressed by the report. He stated that B & W had a reputation that it cared about, because its employees and their friends and families care about what kind of company they work for, and because its customers care about the reputation of the company from which they buy their cigarettes. He also testified that B & W's reputation among government entities and among its suppliers and creditors is important.

He acknowledged that the FTC staff report involved in this case had criticized B & W several years before the broadcast for some of its advertising practices and this hurt B & W's reputation. He also testified that B & W kept records that would show the increase or decrease in sales in any particular product, such as Viceroy, at a particular time in a particular market, such as the Chicago metropolitan area, but that no one was aware of a decline in the sale of Viceroy or other B & W products.

(5) Plaintiff called a professor of journalism to sponsor an advertising agency's estimate of the cost of a campaign through the television viewing area designed to correct the effects of the Jacobson broadcast. Although the witness was prepared to testify that the cost estimates appeared to be reasonable, he had no part in the preparation of the report. Moreover, the report was prepared before the jury's liability verdict was given publicity and the witness was not prepared to say whether such a campaign was appropriate after the wide publicity given the jury's verdict on liability. This testimony and report, which would

have supported a damage claim of approximately $850,000, was refused.

(6) The only other evidence of damages was proof of the repetition of the Jacobson broadcast in an edition of the *Saturday Evening Post*. No evidence was offered concerning the effect of this republication, but in final argument counsel for plaintiff suggested that the number of issues in which republication appeared supported a claim for several million dollars.

There was no evidence that Viceroy lost sales, lost a distributor, lost profits, or had an employee quit or stop working as effectively and enthusiastically as he used to, or that any individual stopped smoking Viceroys or any other B & W product, or that the company experienced any additional difficulty in dealing with any government entity, any creditor, or any supplier. No evidence was offered as to B & W's investment in Viceroy advertising during the period 1978 to 1981, nor was any attempt made to show that the value of Viceroy advertising was destroyed.

 In almost any other kind of case, the court's response would be clear: direct or set aside the compensatory damage verdict or order a new trial on damages. *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1144 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1489, 89 L.Ed.2d 892 (1986); *Taliferro v. Augle,* 757 F.2d 157, 162 (7th Cir.1985). As the Seventh Circuit so tersely put it, "if [plaintiffs] want damages they must prove them." *Douglass,* 769 F.2d at 1144. Plaintiff clearly did not prove any actual damages, let alone three million dollars' worth.

The compensatory damage question is complicated, however, because this is a case of libel *per se,* and it is well-established that in cases of libel *per se* plaintiff is entitled to "presumed damages." *E.g., Lorillard v. Field Enterprises, Inc.,* 65 Ill.App.2d 65, 213 N.E.2d 1, 7 (1st Dist. 1965); *Van Norman v. Peoria Journal-Star, Inc.,* 31 Ill.App.2d 314, 175 N.E.2d 805, 814–15 (2d Dist.1961). "If the words are libelous *per se,* it is not necessary to allege or prove special damages, ... dam-

ages being presumed.... Actual or compensatory damages also include general damages such as mental suffering and injury to reputation, and these need not be proved by evidence." *Lorillard,* 213 N.E.2d at 7. However, *substantial* damages are not presumed. *Bloomfield v. Retail Credit Co.,* 14 Ill.App.3d 158, 302 N.E.2d 88, 97 (1st Dist.1973) (setting aside a jury award in a case of *per se* libel and ordering a new trial on damages); *see also, e.g., Buckley v. Littell,* 394 F.Supp. 918, 945 (S.D.N.Y.1975), *aff'd in part and rev'd in part on other grounds,* 539 F.2d 882 (2d Cir.1976); *Abell v. Cornwall Industrial Corp.,* 241 N.Y. 327, 150 N.E. 132, 135 (1925) ("a right as a matter of law to compensatory damages does not necessarily imply a right to substantial damages"). In *Buckley,* the district court found no evidence that the plaintiff, who had been the victim of *per se* libelous statements, had suffered any actual injury. The court therefore awarded $1.00 nominal damages as compensatory damages and $7,500 in punitive damages. 394 F.Supp. at 945. (The Second Circuit reduced the punitive damage award to $1,000.) "Presumed" damages does not, therefore, mean that a plaintiff is entitled to any amount a jury sees fit to award, entirely independent of the evidence.

One authority states, "[a]lthough general damages were presumed [at common law], they were nonetheless intended to be an approximate compensation for real injury, 'some estimate, however rough, of the probable degree of *actual* loss a man will suffer given the particular charge against him, even though the loss cannot be identified in money terms.'" R. Sack, *Libel, Slander, and Related Problems* 347 (1980) (quoting *Dobbs on Remedies* § 7.2 at 514 (1973), *citing Dalton v. Meister,* 52 Wis.2d 173, 188 N.W.2d 494 (1971), *cert. denied,* 405 U.S. 934, 92 S.Ct. 947, 30 L.Ed.2d 810 (1972), and Restatement of Torts § 621 (1938)) (emphasis in original). Any other interpretation would allow a plaintiff to recover substantial sums without even attempting to introduce evidence as to injury

and would preclude judicial review of the amount awarded.

 Testimony that employees were distressed, upset, and frustrated is completely irrelevant. They are not plaintiffs; only the corporation is a plaintiff. A corporation is incapable of mental suffering, ordinarily a large component of the intangible harm to a human libel victim. *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 540 (7th Cir.1982). There was no evidence that plaintiff was actually experiencing increased difficulty from any governmental entity—only that the tobacco industry was affected by government regulation and one witness's *opinion* that the broadcast *would* have a negative effect. Similarly, there was no evidence that plaintiff actually suffered in the marketplace, only second and third hand reports of questions and negative comments by some customers. Since these questions and negative comments were reported only as hearsay, the substance of the remarks was not admitted.

 Moreover, any possible residual effect of the broadcast was greatly reduced if not eliminated by the special verdict findings in plaintiff's favor on liability and by the widespread publicity that the trial testimony and verdict received. (See the compendiums of post-verdict publicity filed by the parties.)[14] The trial and verdict for the plaintiff was covered extensively, accurately, and fairly by both the electronic and press media. The results of the trial on liability were made known to all of the area where the original broadcast aired. Publication of a libel victory will ameliorate whatever injury might have been suffered. R. Sack, *Libel, Slander, and Related Problems* 355 (1980). Plaintiff obtained the declaration it sought in the complaint.

Plaintiff argues that some of the publicity the trial received was unfavorable to B & W and actually harmed plaintiff rather than helping it. But this argument confuses two issues. The negative publicity that B & W received was not the result of the trial and verdict but was primarily the result of other issues related to tobacco and smoking and was directed to the health hazards associated with smoking. Harm to B & W resulting from *this* publicity was not due to Jacobson's broadcast, this trial, or the jury's verdict.[15]

A court may order a new trial if the award "was so excessive that the jury must have been carried away by 'passion and prejudice.'" *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128, 1143 (7th Cir. 1985), or may order a remittitur if it finds that the jury award was not supported by the evidence. *Taliferro v. Augle,* 757 F.2d 157, 161 (7th Cir.1985); *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1391–93 (7th Cir.1984). The court may also set aside a jury verdict and can fix the proper level of damages if a plaintiff is entitled to a particular amount of damages as a matter of law. *McKinnon,* 750 F.2d at 1392. The court in *McKinnon* singled out the situation where a statute specifies a fixed sum as liquidated damages for a violation as an example of a case where it would be appropriate for a trial court to fix the level of damages. However, it was clearly meant only as one example. It is also proper for a court to fix the level of damages where it finds no evidence to support the jury award. *State of Washington v. United States,* 214 F.2d 33 (9th Cir.), *cert. denied,*

14. The parties were directed to file with the court copies of the newspaper reports and transcripts and recordings of the radio and television reports. Judicial notice can be taken of the massive publicity given the jury's verdict on liability. Fed.R.Evid. 201.

15. Plaintiff also objects to judicial notice being taken after the verdict. Plaintiff argues that it was thus precluded from offering evidence and argument in rebuttal. But this argument misinterprets the operation of judicial notice. "With-

in its relatively narrow area of adjudicative facts, the rule contemplates there is to be no evidence before the jury in disproof." Note of Advisory Committee to Rule 201(g). The court takes judicial notice only of the fact that there was widespread publicity that accurately reported the jury's verdict on liability. "In accord with the usual view, judicial notice may be taken at any stage of the proceedings, whether in the trial court or on appeal." Note of Advisory Committee to Rule 201(f).

348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954), (affirming the trial court action in setting aside a verdict of $581,721.91 and directing that judgment be entered in the sum of $1.00 as nominal damages on the ground that there was not substantial evidence to support the jury's findings); *see Garrett v. Faust*, 183 F.2d 625 (3d Cir. 1950), *cert. denied*, 340 U.S. 931, 71 S.Ct. 493, 95 L.Ed. 672 (1951), (reducing the jury award from $17,000 to $3,609.10, where the interrogatories to the jury showed that they had awarded the difference, $13,390.90, as damages for either breach of contract or fraud and there was no evidence to support liability on either of those claims). These cases are consistent with *McKinnon*, since the decision whether there was sufficient evidence to go to the jury and therefore whether judgment notwithstanding the verdict should be granted is a question of law. *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 285 (7th Cir.1982).

■ Defendants moved for a directed verdict on the issue of compensatory damages at the end of plaintiff's evidence on damages and again at the end of all the evidence on damages. Because Illinois law requires that actual injury be proved in order to recover *substantial* compensatory damages, and because plaintiff submitted no evidence showing actual injury, the court finds as a matter of law that a verdict should have been directed and judgment should be entered notwithstanding the verdict. The award of three million dollars is set aside and judgment will be entered in favor of the plaintiff in the amount of $1.00 as nominal compensatory damages.[16]

■ Nominal compensatory damages are permitted by the law. They serve the purpose of vindicating plaintiff's reputation. *See Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976); *cert. denied*, 429 U.S. 1062,

97 S.Ct. 786, 50 L.Ed.2d 777 (1977); *Airlie Foundation, Inc. v. Evening Star Newspaper Co.*, 337 F.Supp. 421 (D.D.C.1972). They also serve as a foundation for punitive damages. They do not provide an unwarranted windfall.

### B. Punitive Damages

Defendants move the court to set aside the awards of punitive damages and order judgment notwithstanding the verdict, a new trial, or a remittitur. In support of this motion defendants make essentially three arguments: (1) that punitive damages in a case of a public figure plaintiff are unconstitutional, even when a plaintiff proves both actual malice and express malice (also known as common law malice); (2) that the jury was improperly instructed on the issue of express malice; and (3) that there was no evidence to support a finding of express malice. Defendants also contend that evidentiary errors affected the award of punitive damages.

■ In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325, 94 S.Ct. 2997, 3000, 41 L.Ed.2d 789 (1974), the Supreme Court stated that defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth are restricted to compensation for actual injury. 418 U.S. at 349, 94 S.Ct. at 3011. Punitive damages are therefore unavailable unless the plaintiff proves actual malice. Here, plaintiff did prove actual malice. Defendants argue, however, that when the plaintiff is a public figure and the statement concerns a matter of public interest, punitive damages are unavailable *even if* plaintiff proves actual malice, as a matter of constitutional law. But the Seventh Circuit has clearly stated that if a public figure plaintiff does prove actual malice it can recover punitive damages. *Brown & Williamson*, 713 F.2d 262, 273 (7th Cir.1983); *Carson v. Allied*

---

**16.** If it should be found, on appeal, that it is improper to set damages by granting judgment notwithstanding the verdict, then, alternatively, the court finds that the award of three million dollars in compensatory damages was excessive and orders a remittitur of $2,999,999.00, reducing the award to $1.00, with the condition that if plaintiff chooses to reject the remittitur there be a new trial on the issue of compensatory damages. *McKinnon*, 750 F.2d at 1391–92. Fed.R. Civ.P. 50(c)(1).

**1264**

*News Co.*, 529 F.2d 206, 214 (7th Cir.1976). Therefore, this court must reject defendants' argument.

■■■ Defendants argue that the instruction to the jury on "express malice" was incorrect and applied a more relaxed standard than required by Illinois law. The jury was instructed that punitive damages are imposed to punish a defendant who the jury finds is guilty of "ill-will, evil motive, intention to injure without just cause or excuse, or a wanton disregard of another's rights." (Tr. 2224). This charge is consistent with Illinois law and in fact mirrors the language defining common-law malice in *Fopay v. Noveroske*, 31 Ill.App.3d 182, 334 N.E.2d 79, 91 (5th Dist.1975). *See also Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 565, 384 N.E.2d 353, 359 (1978) (punitive damages may be awarded when torts are committed "with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others"); *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986) ("Illinois courts have long recognized that punitive damages are appropriate when torts are committed with fraud or actual malice or when the defendant acts willfully or with a wanton disregard for the rights of others").

Defendants argue that the Seventh Circuit opinion in this case required that express malice be limited to those situations where a statement was "made solely for the purpose of causing harm to the person defamed." 713 F.2d at 272 (quoting Restatement of Torts § 611(b) (1938)). However, in the Seventh Circuit opinion, § 611(b), and *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill.2d 112, 214 N.E.2d 746 (1966) (relied on by the Seventh Circuit), the issue was under what circumstances the privilege of fair summary was forfeited—not under what circumstances punitive damages could be awarded. Although the courts used the expressions "actual malice" (in *Lulay* ) and "express malice" (in *B &*

*W* ), that appears to be merely a reflection on the imprecision of the language (assuming the standards are different). In light of *Michaels* and the other more recent Illinois cases dealing with punitive damages, the Seventh Circuit was not reciting the standard for punitive damages in *B & W.*

■■■ The evidence was such that a reasonable jury could find that defendants made the broadcast with "express" or "common-law malice." The content of the broadcast, together with the fact that defendants knew it to be false or seriously doubted its truth (as found by the jury and upheld by this court on review), is perhaps the strongest evidence of ill-will on the part of defendants. A jury could find that statements accusing plaintiff of being "slicksters" and "liars" and of attempting to entice children to smoke by disreputable methods, statements held by the Seventh Circuit to be libelous *per se*, are intended to injure B & W. And when defendants knew these statements were false, or seriously doubted that they were true, then a jury could find that the statements were intended to injure B & W without just cause or excuse. As the Seventh Circuit remarked in *Robison v. Lescrenier*, 721 F.2d 1101, 1111 (7th Cir.1983), (quoting the Wisconsin Supreme Court in *Noonan v. Orton*, 32 Wis. 106, 113 (1873), and applying the Wisconsin rule on punitive damages very similar to that of Illinois): "The making of a false accusation, knowing it to be false, could hardly be regarded as otherwise than malicious." A reasonable jury could have concluded that defendants acted with express malice.

■■■ The amounts of the punitive damage awards were not excessive. In fixing the amount of punitive damages, the jury was entitled to consider defendants' wealth. *Hazelwood v. Illinois Central Gulf Railroad*, 114 Ill.App.3d 703, 71 Ill. Dec. 320, 328, 450 N.E.2d 1199, 1207 (4th Dist.1983); *Fopay v. Noveroske*, 31 Ill. App.3d 182, 334 N.E.2d 79, 93 (5th Dist. 1975). As the court explained in *Hazelwood*, "[p]unitive damages should be large enough to provide retribution and deter-

rence but should not be so large that the award destroys the defendant." 71 Ill.Dec. at 328, 450 N.E.2d 1199, 1207. The evidence showed that CBS's net worth was approximately one and one half billion dollars, making the two million in punitive damages only approximately 0.13% of that net worth. And the net worth of Jacobson was over five million dollars, making the fifty thousand dollars in punitive damages awarded against him less than 1% of his net worth.

■ The jury was also entitled to consider the amount of attorneys' fees incurred by the plaintiff in finding punitive damages. *Hazelwood*, 71 Ill.Dec. at 327, 450 N.E.2d at 1206; *Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.*, 85 Ill.App.3d 1108, 41 Ill.Dec. 147, 156, 407 N.E.2d 645, 654 (1st Dist. 1980). Plaintiff's attorneys' fees as of the time of trial amounted to more than 1.36 million dollars—more than two-thirds of the punitive damage award.

■ Finally, there was evidence presented that after the verdict on liability had been rendered, Jacobson stated in public that he would not allow the verdict to affect his professional conduct. Since one purpose of punitive damages is deterrence, a jury can properly consider evidence of recalcitrance in determining the punitive damage award. *See Goldwater v. Ginzburg*, 414 F.2d 324, 341 (2d Cir.1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); *Machleder v. Diaz*, 618 F.Supp. 1367, 1375–76 (S.D.N.Y.1985). In light of all the circumstances, the punitive damage award was not excessive and should stand.

IT IS THEREFORE ORDERED that:

(1) Defendants' motion for judgment notwithstanding the verdict or a new trial is denied as to liability.

(2) Defendants' motion for judgment notwithstanding the verdict is granted as to compensatory damages and the court enters judgment in the amount of $1.00 as nominal compensatory damages.

(3) Defendants' motion for judgment notwithstanding the verdict, a new trial, or a remittitur as to punitive damages is denied. Punitive damages shall stand at two million dollars as to CBS and fifty thousand dollars as to Jacobson.

## APPENDIX A

## V. EFFORTS OF SOME CIGARETTE ADVERTISEMENTS TO DIVERT ATTENTION AWAY FROM THE HEALTH HAZARDS OF SMOKING

Many cigarette advertising techniques appear to denigrate or undercut the health warning. Information obtained from subpoenaed documents indicates that, at least in the case of several advertising campaigns, these techniques have been carefully planned. For example, documents from Brown & Williamson (B & W) and one of its advertising agencies, Ted Bates and Company, Inc., set forth the development of an advertising strategy for Viceroy cigarettes designed to suppress or minimize public concern about the health effects of smoking.

The documents show that, at the request of Ted Bates, a marketing and research firm conducted a number of focus group interviews on the subject of smoking in order to assist the ad agency in developing a marketable image for Viceroy cigarettes.[39] The final report summarizing the results of this research asserts that many smokers perceive the smoking habit as a "dirty" and dangerous one engaged in only by "very stupid people."[40] The report concludes:

---

**39.** Document A011345—"An Action-Oriented Research Program For Discovering And Creating The Best Possible Image For Viceroy Cigarettes," prepared for Ted Bates Advertising in March 1975 by N. Kennan, Marketing and Research Counselors, Inc.

**40.** Document A901268—May 26, 1975 "What Have We Learned From People? A Conceptual Summarization of 18 Focus Group Interviews On The Subject Of Smoking."

Thus, the smokers have to face the fact that they are illogical, irrational and stupid. People find it hard to go throughout life with such negative presentation and evaluation of self. The saviours are the *rationalization* and the *repression* that end up and result in a defense mechanism that, as many of the defense mechanisms we use, has its own 'logic', its own rationale.

\* \* \* \* \* \*

Thus, smokers don't like to be reminded of the fact that they are illogical and irrational. They don't want to be reminded by either *direct* or *indirect* manner.[41]

The report proceeds to describe the elements of a good cigarette advertising campaign, in light of its findings, in a chapter entitled, "How To Reduce Objections To A Cigarette." The basic premise of the report's recommendations is that since there "are not any real, absolute, positive qualities and attributes in a cigarette," the most effective advertising is designed to *"reduce objections"*[42] to the product by presenting a picture or situation ambiguous enough to provide smokers with a rationale for their behavior and a means of repressing their health concerns about smoking. To provide a rationale for smoking, the ad must project the image that cigarettes provide the smoker with social acceptance, an acceptable means of rewarding himself or herself, a stimulant, a tranquilizer, a better self-image, etc. With regard to health issues, the report recommends: "Start out from the basic assumption that cigarette smoking is dangerous to your health—try to go around it in an elegant manner but don't try to fight it—it's a losing war."[43]

One chapter of the report describes how the company can introduce "starters" to the Viceroy brand, a discussion which focuses almost exclusively on how to persuade young people to smoke. The report asserts:

For the young smoker, the cigarette is not yet an integral part of life, of day-to-day life, in spite of the fact that they try to project the image of a regular, run-of-the-mill smoker. For them, a cigarette, and the whole smoking process, is part of the illicit pleasure category ... In the young smoker's mind a cigarette falls into the same category with wine, beer, shaving, wearing a bra (or *purposely* not wearing one), declaration of independence and striving for self-identity. For the young starter, a cigarette is associated with introduction to sex life, with courtship, with smoking 'pot' and keeping late studying hours.[44]

The chapter then recommends a strategy for attracting young "starters" to cigarette smoking:

Thus, an attempt to reach young smokers, starters, should be based, among others, on the following major parameters:

—Present the cigarette as one of a few initiations into the adult world.

—Present the cigarette as part of the illicit pleasure category of products and activities.

\* \* \* \* \* \*

—In your ads create a situation taken from the day-to-day life of the young smoker but in an elegant manner have this situation touch on the basic symbols of the growing-up, maturity process.

—To the best of your ability, (considering some legal constraints), relate the cigarette to 'pot', wine, beer, sex, etc.

—*Don't* communicate health or health-related points.[45]

B & W adopted many of the ideas contained in this report in the development of a Viceroy advertising campaign. Thus, in a document entitled, "Viceroy Strategy," B & W notes repeatedly that its advertising

41. *Id.* at 2, 3 (emphasis in original).

42. *Id.* at 12 (emphasis in original).

43. *Id.* at 17.

44. *Id.* at 29–30 (emphasis in original).

45. *Id.* at 31.

campaign must provide consumers with a rationalization for smoking and a "means of *repressing* their health concerns about smoking a full flavor Viceroy." [46] The following excerpts from "Viceroy Strategy" are representative and indicate that in B & W's view, the other cigarette companies also have developed advertising strategies designed to cause repression of consumer health concerns about smoking:

> Full flavor smokers perceive cigarette smoking as dangerous to their health ... Given their awareness of the smoking and health situation, they are faced with the fact that they are behaving illogically. They respond to this inconsistency by providing themselves with either a rationalization for smoking, or, by repressing their perceptions of the possible dangers involved. *To date, major full flavor brands have either consciously or unconsciously 'coped' with the smoking and health issues in advertising by appealing to repression.* [emphasis added.]

\* \* \* \* \* \*

The marketing efforts must cope with consumers' attitudes about smoking and health, either providing them a *rationale* for smoking a full flavor VICEROY or providing a means of *repressing* their concerns about smoking a full flavor VICEROY. [emphasis in original.]

\* \* \* \* \* \*

*Advertising Objective*—To communicate effectively that VICEROY is a satisfying flavorful cigarette which young adult smokers enjoy, by providing them a rationalization for smoking, or, a repression of the health concern they appear to need.

B & W then describes its plan to accomplish its advertising objective. Three advertising strategies would be used:

1. The 'satisfaction' campaign provides a *rationalization:* VICEROY is so satisfying that smokers can smoke fewer cigarettes and still receive the satisfaction they want. . . .

2. The 'tension release' campaign provides a *rationalization:* VICEROY'S satisfying flavor can help the smoker in a tense situation. . . .

3. The 'feels good' campaign appeals to the smoker by *repressing the concerns* he may have about smoking *by justification:* If it feels good, do it; if it feels good, smoke it. . . . [47]

B & W documents also show that it translated the advice on how to attract young "starters" into an advertising campaign featuring young adults in situations that the vast majority of young people probably would experience and in situations demonstrating adherence to a "free and easy, hedonistic lifestyle." [48]

---

**46.** Document A015538—"Viceroy Strategy," March 3, 1976, V.C. Broach, Group Project Manager, B & W (emphasis in original).

**47.** These strategies were employed in a six-month media campaign conducted in three test cities in 1976. The advertising allotment for the campaign was approximately ten times the normal advertising dollar amount for a six month period. (Document A015486—Memorandum from M.M. Matteson to V.C. Broach, July 14, 1976, emphasis added).

**48.** Document A080115—"Viceroy Marketing/Advertising Strategy," January 26, 1976.